# CLAUS v. FARMERS & STOCKGROWERS STATE BANK, ET AL.

(No. 1968; December 22, 1936; 63 Pac. (2d) 781)

46

For the plaintiff and appellant, there was a brief and oral argument by *W. A. Hilton* of Salt Lake City, Utah, and *J. A. Greenwood* of Cheyenne, Wyoming.

For respondent, The Farmers and Stockgrowers State Bank of Lyman and its directors, there was a

brief and oral argument by *P. W. Spaulding* of Evanston.

For the respondent, First Security Bank of Rock Springs, there was a brief by *Lewis H. Brown* of Rock Springs, Wyoming, and *Thatcher & Young* of Ogden, Utah, and oral argument by *Mr. Brown.*

RINER, Justice.

The record in this case is brought here by direct appeal proceedings to review a judgment of the district court of Uinta County in an action wherein Pauline Hamblin Claus was plaintiff and The Farmers and Stockgrowers State Bank, a corporation, First Security Bank of Rock Springs, a corporation, A. E. Wilde, State Examiner of the State of Wyoming, Robert Hickey, Cal Hickey, Joe Hickey, J. W. Slade, L. R. Blackner and Edward Stadmiller, Jr., were defendants. Before trial the State Examiner was by the plaintiff voluntarily dismissed from the case. For brevity and convenience in statement Pauline Hamblin Claus may hereinafter be mentioned as the "plaintiff" or "Mrs. Claus" and the corporate defendants in the order named above will be designated as "the Lyman Bank" and "the Rock Springs Bank." The other individual defendants were directors and officers of the Lyman

Bank during the period of time the events occurred which are connected with this litigation. They will generally be so mentioned and particularly Robert Hickey as president, J. W. Slade as vice-president and Edward Stadmiller, Jr., as cashier of that institution.

The facts to be considered on this appeal are in substance these: The Lyman Bank during the year 1932 and for some years prior thereto was a corporation holding its charter from the State of Wyoming and doing a banking business in the town of Lyman located in the southwestern part of this state. Its capital stock was $10,000, with one hundred shares of stock of the par value of $100.00 per share, of which the individual defendants above named held, Robert E. Hickey 19½ shares, Cal Hickey, Joe Hickey, J. W. Slade, L. R. Blackner 5 shares each, and Edward Stadmiller, Jr., 43½ shares. Mrs. Claus also was a stockholder to the extent of 5 shares. This bank was authorized to conduct both a commercial and savings bank business.

On February 25, 1932, Mrs. Claus had on deposit with said bank the following accounts in its commercial department, viz.: $61.53 listed on the bank's books in her own name and $440.93 in the name of "H. & R. Root Beer." She also had in its savings department in her own name the sum of $3836.01. On the date last mentioned and all the time during the year 1932 this bank was insolvent. Knowing this condition prevailed in the bank's affairs, on that date, Robert E. Hickey, its president, and Edward Stadmiller, Jr., its cashier, went to Salt Lake City and interviewed Mrs. Claus at her residence there. She was told bythese officials of the bank that the bank would have to close its doors; that it might be closed at any time; indeed, by the time they returned to Lyman; that if it did close she would receive only twenty-five per cent of her deposits; that the bank owned a portion of Lot 7 in Block 10 in the Town of Lyman, on which was located a one story

building; that the bank held a contract dated the 7th day of November, 1931, with one L. R. Reed and wife, whereby these parties had agreed to buy this property from the bank for the sum of $4500.00. Of this amount the sum of $10.00 had been paid in cash at the time the contract was executed and the balance was to be paid at the rate of $60.00 per month, with interest at eight per cent per annum, the first payment to be made on January 2, 1932, and the remaining installments were to be forthcoming on the first of each following month.

Just here it is proper to note that the record shows that on August 16, 1929, the bank acquired this property from J. W. Slade as administrator of the estate of Jennie Jenks, deceased, for a consideration of $3400.00; that Mr. Slade, a director and a vice-president of the Lyman Bank, testified as a witness for the defendants that the fair market value of the building on February 26, 1932, was approximately $4000.00. It also appears that after the first payment of $10.00 on the contract was made nothing further was ever advanced thereon by the Reeds.

The officials aforesaid then told Mrs. Claus that this contract was the only thing and the best thing they had to offer her for her money in the bank, and that they wanted her to feel that they were favoring and protecting her in offering her the contract. To this Mrs. Claus responded that she wanted her money, but was immediately advised by the officials she could not have it. Thereupon Mrs. Claus told them she wanted to talk the matter over with her husband and that they could come back in an hour. They did so, and Stadmiller, the cashier, then said to her and her husband, "We want you to feel that we are favoring Mrs. Claus by offering this contract and protecting her; we cannot go to all our customers this way." Mrs. Claus replied that under these conditions she might, as she

testified, "have to consider the contract," but that the abstract of title to the property must be brought up to date, clear and satisfactory. She also testified that Stadmiller then said, "You may rest assured it will be brought up to your satisfaction." Robert E. Hickey, the Lyman Bank's president, in his testimony in the case, appears not to question the substance of the conversations with Mrs. Claus as given above, except that he states she told them to "send the abstract down with the contract and deed," that nothing was said as to what the abstract should show, and that she "decided" to "take the contract for the Reed building."

On February 27th following Mrs. Claus received a letter dated the date before from R. E. Hickey, the president of the Lyman bank, wherein it was stated that there were enclosed to her a warranty deed, abstract of title, the contract aforesaid and insurance policy covering this property in Lyman. The contract itself seems never to have been formally assigned to Mrs. Claus. This letter also stated:

"The total purchase price of this contract is $4,460.00, and we have charged your accounts with $4,338.47, leaving a balance to be collected by us from Mr. Reed of $121.53, which will be taken care of in the next two months, and then we will make the collections and forward direct to you.

"In order to clear our records in the matter, we would appreciate if you would forward us the savings pass-book for our files, as we have charged your accounts as follows:

| "Personal account | $61.53 | |
|---|---|---|
| H. & R. Root Beer | 440.93 | |
| Savings Account | 3,836.01 | $4,338.47" |

Accompanying this letter also were two slips of paper, each designated "Advice of Charge," both dated "2-26-32," one for $61.53, the other for $440.93, and each bearing notation in Stadmiller's handwriting, "Part Payment on L. R. Reed Contract;" and also a

third slip of paper of similar date, designated "Savings Withdrawal Ticket," and reading:

"Debit
Acc't No. 118                    Date    2-26, 1932
   Received from Savings Department of The Farmers & Stockgrowers State Bank, 99-126, Lyman, Wyoming, Thirty Eight Hundred Thirty Six and 01/100 Dollars $3836.01, which amount has been charged on my savings pass book No. 118.";

this ticket was signed in Stadmiller's handwriting "Pauline Hamblin Per E. S." over the words "owner of said pass book." The several bank ledger sheets carrying these accounts all show the accounts charged off as indicated by these slips. Mrs. Claus, however, never surrendered her pass book to the Lyman Bank, and testified she never authorized the charges or the withdrawal of her savings account.

Upon examining the abstract of title thus transmitted, Mrs. Claus found it not brought up to date, and consequently sent it back by registered mail to Stadmiller at Lyman, asking him to bring it up "free and clear." Under date of March 5, 1932, Stadmiller wrote Mrs. Claus acknowledging receipt of the abstract and stating that it had been on that day forwarded to the County Clerk of Uinta County for extension; that "this will be returned to you as soon as the County Clerk sends it back to us. It is usually four or five days before we get them back," and "Please be assured that we will take care of this matter to your entire satisfaction."

The abstract of title was never extended to the date of the transaction between Mrs. Claus and the bank officials on February 25, 1932, was never again sent to Mrs. Claus, and was introduced in evidence on the trial by the defendants, at which time it showed a final certificate thereto dated the 23rd day of November, 1931. Not hearing anything further about the abstract,

the latter part of April, 1932, Mrs. Claus and her husband saw Stadmiller, the cashier, and Slade, the vice-president of the Lyman Bank, in Salt Lake City. She testified that she told them she wanted them to take "these contract papers back"; that Stadmiller said, "You keep them for a little while," and that he expected to get some money to pay her. Slade testified that at that time Mrs. Claus wanted Stadmiller to sell the Reed building to get her money. On rebuttal Mrs. Claus stated that she never told Stadmiller at that time that she wanted them to sell the Reed property for her. After this conversation and sometime the latter part of April, Mrs. Claus went to the Lyman Bank, found Stadmiller there, and said to him that she had brought the contracts back and did not want to have anything more to do with them; that he picked them up and said, "All right"; that she then told him, "I want my accounts to stand just as they were," and he said he would put them back.

Subsequently, on May 10, 1932, Mrs. Claus drew her check upon the Lyman Bank to the order of "The Aspen Mt. Gas Co.," for $5.96, and on the 13th of that month she drew another check to the order of "Cash" for $55.57. Both of these checks were paid by the Lyman Bank on May 13, 1932. That day also she drew two more checks, these being on the "H. & R. Root Beer" account. One of these was to the order of "Cash," for $256.13, and was paid by the bank on the same day; the other check was to the order of the Lyman Bank, which through Stadmiller was looking after the payment of the premium on a policy of insurance which she carried on a building owned by her in the town of Lyman. The amount of this check was $184.80. Later, as she testified, Stadmiller returned to Mr. Claus $20.00, telling him at the time that he (Stadmiller) had overcharged on the premium to this ex-

tent. This check seems to have been paid according to the bank's ledger sheets on November 12, 1932.

When, after the end of the month of May, the posting machine prepared bank statements, with her cancelled checks, were returned to Mrs. Claus, relative to her two commercial accounts, the amounts of the three checks first above described had written after them in red letters "O D." The same situation is disclosed upon the bank's ledger sheets. Mrs. Claus testified that nothing was ever said to her by the bank officials regarding these checks after they came back paid, and that she did not look at the statements thus sent her until in 1933 after the bank had ceased to do business.

J. W. Slade, the Lyman Bank vice-president, stated in his testimony that these letters, "O D," indicated that the accounts were overdrawn in the amounts stated, and that he first learned of this situation sometime in July, 1932, from the cashier Stadmiller; that the latter told him that he (Stadmiller) "had allowed her to draw this much money on overdraft account," and that he never knew Mrs. Claus' savings account was reinstated. Hickey, the president of the Lyman Bank, says he did not know it and that Stadmiller was without authority to permit it. Nevertheless, after the vice-president Slade learned of these purported overdrafts, nothing further appears to have been done concerning the matter by either the officials or the directors as a body. Meanwhile, from February 25, 1932, to December 28 following, the bank was permitted to continue receiving deposits whenever any one offered them, and the institution apparently was run as if it were a solvent concern.

September 15, 1932, Mrs. Claus presented her savings bank pass book to Stadmiller, the cashier, at the Lyman Bank. Theretofore, about January 7 or 8, 1932, Mrs. Claus had withdrawn the interest due January 1, 1932, on her savings bank account and had received

payment therefor in the form of a cashier's check sent her. On the date in September above mentioned she was allowed to withdraw the interest due on said account on July 1, 1932, in cash, and Stadmiller, the cashier, made the entry of both these items in her pass book and returned it to her. According to Mrs. Claus' testimony she made a number of demands on Stadmiller during the summer and fall of 1932 for her money in the savings account, and he repeatedly gave her promises that she would have it on dates in the future, which promises were never kept.

Finally, in December, 1932, the situation of the Lyman Bank became so acute that it was necessary for its officials to do something to relieve conditions or close the bank. The Rock Springs Bank had in times past loaned the Lyman Bank money, knew of its condition and had been in 1931 requested by the Lyman Bank officials to take over the latter's deposits, which it declined to do. On December 27th a special meeting of the Board of Directors of the Lyman Bank was held, at which were present Robert, Cal and Joe Hickey, J. W. Slade, L. R. Blackner and Edward Stadmiller, Jr. Mrs. Claus was apparently not notified of this meeting in any way and was not present. These directors then unanimously adopted a resolution that the Lyman Bank sell all of its assets to the directors as individuals, for the sum of $24,930.00, which was obtained through the Rock Springs Bank loaning to the Lyman Bank's directors last above named that sum on their personal obligations given to that bank. The directors then took possession of these assets and turned them over to the Rock Springs Bank for collection and application on the Directors' indebtedness thus incurred. The depositors of the Lyman Bank were paid in full by that institution, through its cashier, Stadmiller, transmitting to the Rock Springs Bank a letter under date of December 28, 1932, reading:

"We hand you herewith our draft for $20,114.37, which we would like to have you place to the credit of the following depositors in the amounts set opposite their names, mailing them receipt for same, together with check book and signature card. In the case of savings accounts, please mail pass book and signature card:"

The letter then set out the name of each depositor, his address and the amount to his credit. The Rock Springs Bank carried out the directions thus given. The difference between the draft amount mentioned in said letter and that referred to in the resolution aforesaid was used by the Lyman Bank to take care of other general obligations of that concern. So far as the Rock Springs Bank knew the list of the depositors and the amounts due them was correct and complete, and it was so assured by the Lyman Bank officials upon being specifically asked concerning the matter, but Mrs. Claus' name was not included in the list thus furnished, and that Bank never learned of her situation until after the transaction had been completed.

The State Examiner orally and in writing approved the arrangement between the Rock Springs Bank and the Lyman Bank's directors, made as aforesaid, as a voluntary liquidation, pursuant to Chapter 10-529 W. R. S. 1931, although no public newspaper notice appears to have been given as required by that section. Neither the Examiner nor his subordinates seem to have learned of the true situation in which Mrs. Claus' matter stood at that time. So far as the record before us shows, the amount thus paid by the directors for the Lyman Bank's assets was far more than these were in fact worth and the arrangement seems to have been, so far as the transfer is concerned, a fair transaction and greatly to the benefit of the bank.

On the 22nd day of December, 1933, Mrs. Claus served on R. E. Hickey, as president of the Lyman Bank, a creditor's claim for the credit balance shown

in her savings bank pass book of $3836.01, with interest from July 1, 1932. This claim was not paid, and on February 10, 1934, she brought suit against the defendants above named to recover the amount thus alleged to be due. On behalf of the Lyman Bank and its defendant officials, the defense interposed stated briefly was that Mrs. Claus had been theretofore paid off through the alleged acceptance of her of the real estate transaction of February, 1932, already described. The Rock Springs Bank's defense was in substance that its part in the liquidation scheme of the Lyman Bank as above outlined was undertaken and carried out in good faith, with the full approval of the State Bank Examiner, and without any knowledge of plaintiff's claim until long after the arrangement had been consummated.

The case was tried to the court, with the result that the issues were found in favor of the defendants and against the plaintiff, and it was adjudged that plaintiff recover nothing in the action and that the defendants should recover their costs.

For the plaintiff it is urged that the Rock Springs Bank, being aware of the insolvent condition of the Lyman Bank when it made the loan to the directors of that institution and received from them certain of its assets for collection and application of their indebtedness to the loaning bank, cannot retain them, or any proceeds derived from them; and it is said also that the fact that these assets were of a value far below the amount the directors paid for them "is of no consequence." We cannot fully accede to this view. We think the assets purchased as above described by the directors became their property. The Rock Springs Bank expressly disclaims ownership thereof. It has simply, under direction of its debtors, applied their property to the payment of their debts, and in our judgment it had the right to do this. So far as the

evidence in this case discloses the entire transaction with the Rock Springs Bank was begun and carried out in entire good faith as respects the loan to the directors of the Lyman Bank and the purchase of its assets. This arrangement was definitely understood by the State Examiner, and received both his oral and written approval. What was done was not on its face a violation of Section 10-502 W. R. S. 1931, for that section forbids those transfers of assets only which are "made after the commission of an act of insolvency, or in contemplation thereof," and "made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another." On the contrary, the purpose of this transaction was solely, as disclosed by the resolution of the directors made December 27, 1932, to pay in full each depositor in the Lyman Bank, and the cashier was directed "to do all things necessary or convenient for the carrying into full force and effect" that resolution. As we have seen, on the following day, Stadmiller, as cashier, sent to the Rock Springs institution a list of both the commercial and savings bank depositors in the Lyman Bank, with a draft in an amount sufficient to meet all these obligations and with directions to that institution to deposit these funds to the credit of the several depositors, and this was done.

It appears that Mrs. Claus' name alone was omitted from that list and this fact and the consequences flowing from it is, of course, the cause of this lawsuit. The omission occurred, so far as we can ascertain, through a misapprehension, whether unintentional or otherwise, on the part of the directors and officers of the Lyman Bank conversant with the matter, of the true legal import of the alleged transfer in February, 1932, of the real estate and L. R. Reed contract affecting it, as will presently appear. We fail to see that this fact

is sufficient ground for overthrowing the entire transaction in question and depriving all the other depositors in the Lyman Bank, more than two hundred in number, of its benefits. The Rock Springs Bank knew nothing about Mrs. Claus' situation, and merely carried out the directions of the Lyman Bank in paying off the latter's depositors. Its directors saw fit to pay that bank for the assets they received far more than they were worth. We think, under such circumstances, they were entitled to retain them, except as against the plaintiff's claim, as a consequence of the sale. They derived no profit from the transaction, and as the record shows, will suffer material loss. The plaintiff was herself benefited by the arrangement, for if it were not permitted to stand and the State Examiner obliged to take over the affairs of the bank, she would be subjected undoubtedly not only to the full extent of her liability as a stockholder, but also would receive a comparatively small percentage of her claim as a savings depositor. We do not understand that plaintiff asserts that there was any fraud involved in this sale of the assets of the Lyman Bank to its directors.

This court in Nicholson v. Kingery, 37 Wyo. 299, 261 Pac. 122, has heretofore expressed its views relative to contracts between the directors of a corporation and the corporation itself to the effect that they may make them where the dealings are open, known to the corporate body and above suspicion; that such transactions are to be the subject of the "severest scrutiny," but when that is applied and it appears that the officials have been open, fair and honest in their dealings with the corporation, and have secured no advantage by their contract to its detriment, it will be upheld. In the case at bar, we think the transfer of assets under review does not fail when tested by this rule. As we have indicated already, it was not to the detriment of the Lyman Bank, but to its advantage

and the advantage of all of its stockholders. It was to the advantage also of all of its creditors except Mrs. Claus.

Of similar purport is the case of Hart v. First State Bank of Seminole, Tex. Civ. App., 24 S. W. (2d) 480, where it appeared that a bank's charter had expired and the officers of the institution sold the assets to another bank in which they were the principal stockholders. In the course of its opinion affirming the transaction, the court said:

"The other question which we feel calls for discussion is the validity of a sale from the trustees to a corporation in which they are the principal stockholders.

"There is a great divergence of opinion as to the effect of such sales in the courts of the various jurisdictions, but the weight of authority seems to be that they are only voidable for fraud or unfairness. Tenison v. Patton, 95 Tex. 293, 67 S. W. 92.

"In the case at bar, the trial court evidently concluded that the sale was fair and free from fraud, and we think the evidence is amply sufficient to support such a conclusion.

"There is evidence in the record which shows that the disposition made was the best possible, and that any other would have resulted in an assessment being made upon the stockholders of the old bank, which was prevented under the sale here made. If that be true, then stockholders, such as appellant, could not be heard to complain."

So in Rossing v. State Bank, 181 Iowa 1013, 165 N. W. 254, where the majority stockholders dissolved a banking corporation and transferred its assets to another bank controlled by them, concerning the transaction the court expressed these views:

"The majority has power to order dissolution and the sale of the assets upon such vote as was here had. It had power even to sell it to itself. The courts will closely scrutinize the fairness of such a sale, but that does not affect the original power to make it. One cor-

poration may lawfully sell its assets to another corporation composed in greater part of the majority stockholders of the selling company. Mumford v. Ecuador Development Co., 111 Fed. 639, 643. The mere fact that directors sell property of their corporation to a new corporation of which they are directors and stockholders will not make the sale absolutely void. Manufacturers' Sav. Bank v. O'Reilly, (Mo.) 10 S. W. 865. And so though the sellers control both corporations. Miners' Ditch Co. v. Zellerbach, 37 Cal. 543; Olsen v. Homestead Land & Imp. Co., (Texas) 28 S. W. 944; Smith v. Stone, (Wyo.) 128 Pac. 612. Where a sale is made from one corporation to another, and the directors of one are largely interested in the stock of the other, or the same person or persons own a majority of the stock of both corporations, such sale is not void nor constructively fraudulent, but will be avoided by actual fraud, or if an undue advantage is taken or unconscionable bargain made. 3 Cook on Corporations (7th Ed.), 2113."

The rules governing this point are appropriately summed up by Mr. Justice Potter in Smith v. Stone, 21 Wyo. 62, 128 Pac. 612, thus:

"It may be conceded that it is not within the lawful power of a majority of the stockholders of a solvent going corporation to sell its entire assets and property over the objection of a minority stockholder, unless such power is expressly conferred by law, in the absence of some exigency or a condition requiring that course to be pursued, the law being as stated in Cook on Corporations (6th Ed.) Vol. 2, Sec. 670, that a 'dissenting stockholder may prevent the sale of all the corporate property where the corporation is a solvent going concern.' But a different rule prevails when the corporation is an unprofitable and failing enterprise. (Id. and cases cited; Phillips v. Providence Steam-Engine Co., 21 R. I. 302, 43 Atl. 598, 45 L. R. A. 560; Price v. Holcomb, 89 Ia. 123, 56 N. W. 407.) The rule in such case is stated in Noyes on Intercorporate Relations as follows: 'The general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes.

It is subject to the exception that such sale may be made as a step towards dissolution. The power of a majority to dispose of all the property of a losing corporation, however, is in furtherance of the purposes of the corporation and arises ex necessitate. When the further prosecution of the business of the corporation would be unprofitable, it is the duty, as well as the right, of the majority to dispose of its property and take action towards the liquidation of its affairs.' (Sec. 111.) The fact that two corporations are controlled by the same officers or stockholders does not prevent them from dealing with each other or the purchase by one of the property of the other, unless the acts of the majority in control are fraudulent as against the corporation and complaining stockholders."

See also Miller v. First National Bank of South Bend, et al., (Ind. App.) 1 N. E. (2d) 671, decided May 11, 1936.

We must accordingly decline to interfere with the judgment of the trial court so far as it approved the sale of the assets of the Lyman Bank to its directors, under the circumstances disclosed by this record, except as it may be affected by the liability of the Lyman Bank and its officials through their failure to see to it that Mrs. Claus' claim was listed and paid as were those of the other depositors.

The Lyman Bank and its answering directors rely on the transaction which took place in February, 1932, between Mrs. Claus and R. E. Hickey, as president, and Edward Stadmiller, Jr., as cashier, relative to certain real estate owned by the bank and the L. R. Reed contract to purchase the same. They urge that her conceded claim as a depositor of the bank was fully liquidated by the alleged transfer of that real estate and contract to her. This matter we are obliged to view in a different light from that just discussed.

Section 10-502 W. R. S. 1931, hereinabove cited, reads in full:

"All transfers of notes, bonds, bills of exchange or

other evidence of debt owing to any state bank or of deposits to its credit, all assignments of mortgages, securities or real estate or of judgments or decrees in its favor, all deposits of money, bullion or other valuable things for its use or for the use of any of its shareholders or creditors, and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, shall be utterly null and void. (L. '25, c. 157, § 81.)"

In 3 Michie on Banks and Banking, 99-102, Section 64, discussing the effect of legislation of this character, the text, citing many cases, says that:

"But by statute in most jurisdictions banks are forbidden to make conveyances when insolvent or in contemplation of insolvency, with a view to prefer one creditor to another, and such transactions are void and may be set aside by the receiver, unless the conveyance was to a bona fide purchaser without notice of the insolvency. And any advantages given to directors, officers or stockholders of the bank are particularly obnoxious to this statutory prohibition. All such moneys and securities must be promptly refunded or surrendered."

The language of Section 10-502, quoted above, so far as pertinent here, is practically identical with the provisions of the Act of Congress governing national banks. (12 U. S. C. A. Section 91.) Discussing its effect in Bodley v. Bowman, 131 Kan. 741, 293 Pac. 740, the court says :

"A transfer made for the unlawful purposes is void, although the transferee may have no knowledge of the condition of the bank. His knowledge or want of knowledge of the intention or purposes of the bank officers are immaterial. Ball v. German Bank (C. C. A.) 187 F. 750. That the transfer was made when the national bank was insolvent, that it was made in contemplation of insolvency, and was done with a view of

preferring one of its creditors to another or to prevent the application of its assets ratably among its creditors, has been determined by the jury upon what is deemed to be sufficient evidence. It is contended that the defense is not available to the defendants, that the receiver is not asking its enforcement as he might have done, and that defendants are not in a position to invoke the act of Congress and the federal rule, making the transfer void. Plaintiff could not acquire title to the note by a void transfer. If the transfer was void as against a claim of a receiver, it is equally void when it is sued on by a transferee, who by virtue of the act of Congress did not acquire title through the transfer."

Under the undisputed testimony of the plaintiff above detailed relative to the statements made to her by R. E. Hickey, as president, and Edward Stadmiller, Jr., as cashier of the Lyman Bank, on February 25, 1932, and the allegation in their answer, which was also that of said bank, that on May 10, 1932, "and all prior thereto during the year 1932 said Lyman Bank had been and was insolvent in that it did not possess moneys, property or securities of value sufficient to pay the deposits in said bank, nor more than fifteen per cent thereof, and adding and including the liability of the stockholders upon the then liquidation of said bank it could not have paid its depositors and creditors in excess of twenty five cents on the dollar," we are obliged to conclude that the transaction was attempted to be consummated in the very teeth of the statute, with the evident purpose of preferring Mrs. Claus as a stockholder and a creditor over others similarly situated. That being the case the transfer was null and void and no title to the property in question passed to her. It became her duty to surrender to the bank the evidences of the attempted transfer, as pointed out in 3 Michie on Banks and Banking, Section 64, supra. We have already observed that she did this the latter part of April, 1932.

Mrs. Claus established a prima facie case when she proved her deposit of money with the Lyman Bank in its savings department and that it had never been repaid to her. The only answer of the bank and its officials to her claim is their reliance upon an illegal transaction, the alleged transfer to her of the property aforesaid, to accomplish an unlawful preference. It is unnecessary to cite authorities to establish that such a defense may not succeed. To permit it would, of course, be to enforce an illegal contract, which the courts invariably decline to do.

Even assuming the contract to have been a proper one, the same conclusion must be reached so far as the matter affects the disposition of this case when we recall that Mrs. Claus was told by Hickey, as president, and Stadmiller, as cashier of the Lyman Bank, that the reason she should take the transfer of the property aforesaid was because the Lyman Bank was going to close, that it might be closed before these officials returned from Salt Lake City to Lyman and that if it did close she would receive only twenty-five per cent of her deposits in the concern. This representation was not true, as Mrs. Claus learned thereafter. In fact, the Lyman Bank did not close at that time and not until the month of December following the alleged transfer aforesaid, and ultimately all the other depositors were paid in full.

Where one of the parties to a transaction is in a position where he should have superior and accurate knowledge concerning the matters to which his statements relate, the original rule of inability to predicate fraud on promises or statements with regard to future events has been altered. Says 26 C. J. 1090: "The fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge."

See also 51 A. L. R. 81 and note; Luchow v. Kansas City Breweries Co., (Mo. App.) 183 S. W. 1123; and Crook v. Ford, 249 Mich. 500, 229 N. W. 587.

In State ex rel St. Louis & San Francisco Ry Co. v. Daues, et al., 316 Mo. 474, 290 S. W. 425, it was held that representations by a claim agent of the railroad company, inducing the release of a claim for personal injuries, that the railroad company was going into the hands of a receiver and the releasor probably would not obtain over ten cents on the dollar, these representations being untrue in fact, authorized a rescission of the contract by the latter on the ground of fraud, and the court said:

"The rule that a forecast of what will happen in the future is merely promissory, and not a statement of existing fact, does not apply, where the matter involved is peculiarly within the speaker's knowledge. 26 C. J. 1090; Wendell v. Ozark Orchard Co. (Mo. App.) 200 S. W. loc. cit. 749; Stonemets v. Head, 248 Mo. loc. Cit. 252, 253, 154 S. W. 108. A statement may be promissory, or prospective, or an opinion in form, and yet state a fact.

"The present representation was that the Frisco Railroad was going into the hands of a receiver, and the plaintiff probably would not get over 10 cents on the dollar. That implied a financial condition of the Frisco Railroad such as would carry it into the hands of a receiver. The agent was in better position to know the facts about that than the plaintiff."

When in conjunction with the foregoing statements of the Lyman Bank's president and cashier to Mrs. Claus there are considered the additional facts appearing in the case that J. W. Slade, its vice-president, testified on the trial that the property to which the Reed contract related was worth only $4000.00 and that at the time that contract was offered to her the buyer had only paid $10.00 thereon, was in default to the extent of two payments and never paid a cent thereafter, we are satisfied that Mrs. Claus had a right to rescind

the contract on account of the misrepresentations thus made. She seems never to have had her attention directed to this condition of the property or the contract when the conversation of February 25, 1932, occurred, or when the papers relating to the transaction were sent her.

In National Bank & Loan Company v. Petrie, 189 U. S. 423, 23 Sup. Ct. 512, 47 L. Ed. 879, Mr. Justice Holmes remarked that:

"The right not to be led by fraud to change one's situation is anterior to and independent of the contract. The fraud is a tort. Its usual consequence is that, as between the parties, the one who is defrauded has a right, if possible, to be restored to his former position. That right is not taken away because the consequence of its exercise will be the undoing of a forbidden deed. That is a consequence to which the law can have no objection, and the fraudulent party, who otherwise might have been allowed to disclaim any different obligation from that with which the other had been content, has lost his right to object, because he has brought about the other's consent by wrong."

It is significant that Mrs. Claus, with reasonable promptness, returned to the bank all that she received from it through the attempted transaction, thereby remitting the parties to their original status.

We may observe also that we think the weight of the evidence fails to establish even that Mrs. Claus accepted the proposition submitted by Hickey and Stadmiller on February 25, 1932, and as again tendered in Hickey's letter of the 26th of that month, transmitting the papers to her. She promptly returned the abstract of title thus forwarded and she never surrendered her savings pass book, as requested by the bank president's letter. It would rather appear, too, that the Lyman Bank acquiesced in her refusal to accept inasmuch as it never had the abstract extended, never returned it to her and it never again demanded the return of her

savings pass book. The conduct of the cashier, Stadmiller, in allowing her checks to be paid, his repeated subsequent promises that she should have her money and his entry of interest withdrawal in cash on September 15, 1932, simply confirm these views.

It results from what has been said that the Lyman Bank is liable to Mrs. Claus for it received her money and has not repaid it. The directors of that bank who purchased and received the assets thereof were charged as trustees with the duty of seeing to it that these assets, or the cash which replaced them, were applied to the payment of each of the bank's creditors. They have not performed that duty as regards Mrs. Claus, and must accordingly be held responsible to her to the extent of her claim.

In 14a C. J., 891-892, it is said that a "transferee of corporate assets will be liable for the debts of the transferor corporation" where "the consideration is paid in such a manner as to exclude the creditors from the benefit thereof." 8 Fletcher's Cyclopedia Law of Corporations 8658, Section 5045, on the authority of many cases, lays down the rule:

"The general principles of law and the statutes governing fraudulent conveyances apply to corporations to the same extent as natural persons, and if a corporation conveys or transfers its property, with intent to hinder, delay or defraud creditors, or without consideration, existing creditors may sue to set the conveyance or transfer aside, and to subject the property to the satisfaction of their claims, or to hold the grantee or transferee liable for its value."

In 8 Thompson on Corporations, Third Edition, 752, Section 6561, the author in speaking of the liability of directors acting as trustee in winding up the affairs of a corporation, states that, "trustees are personally liable to creditors for distributing the assets without payment of debts."

In Miller v. First National Bank of South Bend et al., supra, quite recently decided and already mentioned in connection with the first question considered in this case, it appeared that all the corporate assets of a national bank were transferred to a state bank under an agreement whereby the latter agreed to pay "only the liabilities plus accrued interest thereon of the National Bank as shown by the general ledger of the National Bank as of the close of business on June 4, 1931." Plaintiff was a savings depositor, whose deposit and, consequently, the liability of the National Bank to him, was not included in the liabilities of said National Bank as shown by its general ledger as of the close of business on June 4, 1931. The State Bank declined to pay the depositor and he brought suit to recover the amount alleged to be due. These facts were set out in plaintiff's pleading, and the lower court sustained a demurrer thereto. The reviewing court held this transfer of assets not in violation of Title 12, Section 91, U. S. C. A., hereinbefore mentioned, saying:

"From the language of the above section, it is immediately apparent that any sale or transfer of the National Bank's assets made while insolvent or in contemplation of insolvency is void unless it is also apparent that the intention also was to secure a ratable distribution of its assets to all its creditors."

The court then reached the conclusion that the National Bank by the agreement it had made, as aforesaid, when considered in its entirety, in fact "intended that all its creditors should stand on an equal basis." Reversing the action of the tribunal below in sustaining the demurrer to plaintiff's complaint, the court declared the rule to be:

"That an assignee bank which takes over the liabilities of a National Bank, which is in contemplation of insolvency, becomes liable to every person who might be found to be a depositor, and that the liability of the assignee bank is not limited to such deposit liabilities

as are listed and acknowledged. Baird v. First Nat. Bank (1927) 55 N. D. 856, 215 N. W. 810, 56 A. L. R. 200; Riegel v. Planters' State Bank (1924) 100 Okl. 42, 227 P. 105. A proper action to enforce such an unlisted claim in our opinion is an equitable proceeding against the assignee bank which has taken over all of the real assets of the old bank. Chicago, I. & S. R. Co. v. Taylor (1915) 183 Ind. 240, 108 N. E. 1; Okmulgee Window Glass Co. v. Frink (C. C. A. 1919) 260 F. 159; Cobb et al. v. Interstate Mortgage Co. Corporation (C. C. A. 1927) 20 F. (2d) 786."

The judgment of the district court of Uinta County will be affirmed so far as it affects the Rock Springs Bank and reversed so far as it affects the Lyman Bank and the individual defendants in their denial of plaintiff's claim, with instructions to enter a judgment in favor of the plaintiff for the amount of said claim against the Bank last mentioned and against the other defendants who purchased its assets.

*Affirmed and reversed in part with instructions.*

KIMBALL, Ch. J., and BLUME, J., concur.