BOESCHE, ADMINISTRATOR, *v.* UDALL,
SECRETARY OF THE INTERIOR.

No. 332.   Argued February 25, 1963.—
Decided May 27, 1963.

*Leon BenEzra* argued the cause for petitioner.   With
him on the briefs was *Lewis E. Hoffman.*

*Solicitor General Cox* argued the cause for respondent. With him on the brief were *Louis F. Claiborne, Roger P. Marquis* and *A. Donald Mileur.*

*Scott A. Pfohl, A. G. McClintock, V. P. Cline, Clinton D. Vernon, J. E. Horigan, A. T. Smith, Clair M. Senior* and *L. C. White* filed a brief for the Rocky Mountain Oil & Gas Association et al., as *amici curiae,* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question presented in this case is whether the Secretary of the Interior has authority to cancel in an administrative proceeding a lease of public lands issued under the provisions of the Mineral Leasing Act of 1920, 30 U. S. C. §§ 181 *et seq.,* in circumstances where such lease was granted in violation of the Act and regulations promulgated thereunder. Because of a seeming conflict in principle between the decision of the Court of Appeals in this case, 112 U. S. App. D. C. 344, 303 F. 2d 204, and that of the Court of Appeals for the Tenth Circuit in *Pan American Petroleum Corp.* v. *Pierson,* 284 F. 2d 649, and also because of the importance of the question to the proper administration of the Mineral Leasing Act, we brought the case here. 371 U. S. 886. For reasons stated hereafter we affirm the judgment below.

Section 17 of the Mineral Leasing Act, 30 U. S. C. § 226, authorizes the Secretary of the Interior to grant to the first qualified applicant, without competitive bidding, oil and gas leases of lands in the public domain not within a known geologic structure. These are called "noncompetitive" leases.[1] A departmental regulation provides that "no offer" for a noncompetitive lease "may be made

---

[1] Competitive bidding is required for leases of lands that are within known geologic structures.

for less than 640 acres except . . . where the land is surrounded by lands not available for leasing under the act." 43. CFR § 192.42 (d). "Not available" has always been administratively construed to mean lands not available for leasing to *anyone*. Hence lands covered only by an outstanding application for a lease are considered available, *Natalie Z. Shell*, 62 I. D. 417 (1955), and therefore subject to the 640-acre requirement.

On September 11, 1956, petitioner [2] applied to the Santa Fe Land Office in New Mexico (whose authority also embraces Oklahoma) for an 80-acre noncompetitive lease of land in Oklahoma. There was already on file an application by one Connell for a noncompetitive lease of an adjoining 40-acre tract, but no lease had issued to Connell at the time of petitioner's application. Immediately following petitioner's application two other persons, Cuccia and Conley, filed for a lease of the entire 120 acres. On December 1, 1956, the 40-acre lease issued to Connell, the validity of which is not questioned here. In November 1957 an 80-acre lease issued to petitioner. Following notification that their 120-acre application had been rejected, Cuccia and Conley pursued a departmental appeal, 43 CFR §§ 221.1–221.2. This ultimately resulted in a cancellation of petitioner's lease on the ground that having failed to include in his application the adjoining 40-acre tract (no lease to Connell having then been issued), his 80-acre application was invalid, thus leaving the Cuccia and Conley application in respect of that tract prior in right. Accordingly a lease to them was directed.[3]

The ensuing litigation instituted by petitioner in the Federal District Court resulted in the judgment of

---

[2] Petitioner is actually the administrator of the estate of the original applicant, but for convenience this opinion will disregard the distinction.

[3] Pending the outcome of this litigation, the Land Office Manager has withheld cancellation of petitioner's lease.

the Court of Appeals, now under review, sustaining the administrative cancellation.

Petitioner's claim before this Court[4] rests on § 31 of the Mineral Leasing Act, 30 U. S. C. § 188, as amended, which, in pertinent part, reads as follows:

> "Except as otherwise herein provided, any lease, issued under the provisions of . . . [this Act] may be forfeited and canceled by an appropriate proceeding in the United States district court for the district in which the property, or some part. thereof, is located whenever the lessee fails to comply with any of the provisions of . . . [the Act], of the lease, or of the general regulations promulgated under . . . [the Act] and in force at the date of the lease . . . .

> "Any lease issued after August 21, 1935,[5] under the provisions of . . . [§ 17 of the Act, 30 U. S. C. § 226] shall be subject to cancellation by the Secretary of the Interior after thirty days' notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the land covered by any such lease is known to contain valuable deposits of oil or gas."

Petitioner contends: (1) § 31 is the exclusive source of the Secretary's power to forfeit a lease once it has been issued; (2) the section, by its second paragraph, limits administrative cancellation to instances where a lessee has failed to comply with the terms of his lease and then only so long as the land is not known to contain oil or gas; (3) since petitioner failed to comply not with the terms of his lease but with a departmental regulation, cancella-

---

[4] We limited the writ of certiorari to the single question of the authority of the Secretary to cancel this lease administratively, 371 U. S. 886, not bringing here for review the validity of the Secretary's interpretation of the minimum-acreage regulation which was sustained by the Court of Appeals.

[5] See note 8, infra.

tion of his lease was governed by the first paragraph of § 31, which requires a judicial proceeding.

The Secretary, on the other hand, contends: (1) the provisions of § 31 as a whole apply only to events, whether in violation of lease terms, the Act, or the regulations, occurring *after* a lease has been issued; (2) the Secretary's authority to cancel on the basis of pre-lease events is found not in § 31 but in his general powers of management over lands in the public domain; (3) that authority remained unaffected by the Mineral Leasing Act.

## I.

We think that the Secretary, under his general powers of management over the public lands, had authority to cancel this lease administratively for invalidity at its inception, unless such authority was withdrawn by the Mineral Leasing Act. With respect to earlier statutes containing no express administrative cancellation authority, this Court, in *Cameron* v. *United States*, 252 U. S. 450, found such authority to exist. In there sustaining the Secretary's power to cancel administratively an invalid mining claim, the Court said (at p. 461):

"'True, the mineral land law does not in itself confer such authority on the land department. Neither does it place the authority elsewhere. But this does not mean that the authority does not exist anywhere, for, in the absence of some direction to the contrary, the general statutory provisions before mentioned vest it in the land department.'"

The statutory provisions referred to by the Court are those vesting the Secretary with general managerial powers over the public lands.[6]

---

[6] R. S. §.441, 5 U. S. C. § 485,. charges the Secretary "with the supervision of public business relating to . . . [p]ublic lands, including mines." He is directed by R. S. § 453, 43 U. S. C. § 2, to "perform all executive duties . . . in anywise respecting . . . public

The Secretary has also long been held to possess the same authority with respect to other kinds of interests in public lands: *Harkness & Wife* v. *Underhill*, 1 Black 316; *Lee* v. *Johnson*, 116 U. S. 48; *Orchard* v. *Alexander*, 157 U. S. 372 (all involving homestead entries); *Brown* v. *Hitchcock*, 173 U. S. 473 (selection list); *Knight* v. *United States Land Assn.*, 142 U. S. 161 (erroneous survey); *Hawley* v. *Diller*, 178 U. S. 476 (timber land entry); *Riverside Oil Co.* v. *Hitchcock*, 190 U. S. 316 (lieu land selection).

The continuing vitality of this general administrative authority was recently confirmed by us in *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334.

We are not persuaded by petitioner's argument—based on cases holding that land patents once delivered and accepted could be canceled only in judicial proceedings (*e. g.*, *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 530)—that the administrative cancellation power established by *Cameron* and the other cases cited is confined to so-called equitable interests, and that a lease, which is said to resemble more closely the legal interest conveyed by a land patent, is not subject to such power. We think that no matter how the interest conveyed is denominated the true line of demarcation is whether as a result of the transaction "all authority or control" over the lands has passed from "the Executive Department," *Moore* v. *Robbins*, *supra*, at 533, or whether the Government continues to possess some measure of control over them.

Unlike a land patent, which divests the Government of title, Congress under the Mineral Leasing Act has not only reserved to the United States the fee interest in the leased land, but has also subjected the lease to exacting

---

lands [of the United States]," and R. S. § 2478, 43 U. S. C. § 1201, authorizes him "to enforce and carry into execution, by appropriate regulations, every part of the provisions of . . . [the Title dealing with public lands] not otherwise specially provided for."

restrictions and continuing supervision by the Secretary. Thus, assignments and subleases must be approved by the Secretary, 30 U. S. C. § 187; he may direct complete suspension of operations on the land, 30 U. S. C. § 209, or require the lessee to operate under a cooperative or unit plan, 30 U. S. C. (Supp. IV, 1963), § 226 (j); and he may prescribe, as he has, rules and regulations governing in minute detail all facets of the working of the land, 30 U. S. C. § 189; 30 CFR, pt. 221. In short, a mineral lease does not give the lessee anything approaching the full ownership of a fee patentee, nor does it convey an unencumbered estate in the minerals.[7] Since the Secretary's connection with the land continues to subsist, he should have the power, in a proper case, to correct his own errors.

The dispositive question in this case, therefore, is whether this general administrative power of cancellation was withdrawn by § 31 of the Mineral Leasing Act. To that question we now turn.

## II.

We believe that both the statute on its face and the legislative history of the enactment show that § 31 reaches only cancellations based on *post-lease* events and

---

[7] In contrast, compare the interest of a mining claimant whose location is perfected:

"The rule is established by innumerable decisions of this Court, and of state and lower federal courts, that when the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the right of present and exclusive possession. The claim is property in the fullest sense of that term; and may be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States. The right of the owner is taxable by the state; and is 'real property' subject to the lien of a judgment . . . . The owner is not required to purchase the claim or secure patent from the United States; but so long as he complies with the provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent." *Wilbur* v. *Krushnic,* 280 U. S. 306, 316–317.

leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors.

1. Were § 31 deemed to be the exclusive source of the power to cancel, the Act, in respect of its "first qualified applicant" requirement relating to noncompetitive leases, would be self-defeating. For in cases where there had been no breach of a lease, statute, or regulations *by the lessee*, the factor which alone brings § 31 into play (p. 475, *supra*), the Secretary would be powerless to cancel the lease even if the lessee had not been the first qualified applicant. Thus, a local land office manager might, without fault on the part of the lessee, inadvertently or purposefully issue a lease to a nonqualified applicant. Yet under petitioner's view of the law the Secretary would be wholly unable, either in administrative or judicial proceedings, to remedy such illegal action.

2. The first paragraph of § 31—the one on which petitioner's case depends—speaks entirely in terms of post-lease occurrences. Thus in providing that a lease may be forfeited in judicial proceedings *"whenever the lessee* [not an applicant for a lease] *fails* to comply with any of the provisions of . . . [the Act], of the lease, or of the general regulations promulgated under . . . [the Act] and *in force at the date of the lease . . ."* (emphasis added), the provision clearly assumes the existence of a valid lease. It therefore does not cover a situation where, as here, the lease has not been issued at the time the breach of the Act or regulations occurs, for there is at that time no lease to cancel.

3. The other forfeiture provisions of the Mineral Leasing Act, as originally enacted, are, with one partial exception, also all concerned with post-lease events. Thus cancellation of a lease in judicial proceedings was authorized when the lessee drilled within 200 feet of the lease boundary (§ 16, 41 Stat. 443), or failed to comply with the provision granting rights of way for pipelines through public

lands (§ 28, 41 Stat. 449). And with respect to prospecting permits, administrative cancellation was authorized for the permittee's failure to exercise his prospecting rights with due diligence (§ 26, 41 Stat. 448).[8]

The sole exception to this post-issuance scheme of forfeiture—and only a partial one at that—is found in § 27, 41 Stat. 448, which provides for judicial forfeiture of interests in excess of certain minimum acreage allowances. But even here it is apparent that the statute was less concerned with initially invalid awards of excessive acreage than with the subsequent pooling of the interests of separate grantees, having the effect of avoiding the acreage limitation. Section 27 was in part born of fears that large oil companies might obtain a monopoly of the oil resources in public lands. See H. R. Rep. No. 206, 65th Cong., 2d Sess., p. 5.

4. The background of the Mineral Leasing Act also points against the likelihood that Congress intended to curtail the Secretary's general power respecting administrative cancellation of leases which had been invalidly issued (pp. 476–478, *supra*).

Public lands valuable for their oil deposits had been opened to entry as placer mining claims by the Act of

---

[8] The Act originally authorized issuance of a prospecting permit to a qualified applicant for land not within a known geologic structure. § 13, 41 Stat. 441. In 1935 prospecting permits were converted to noncompetitive leases, 49 Stat. 674, 676, and the provision for administrative cancellation for breach of the conditions of the grant before the land was proven was carried over to § 17. 49 Stat. 678. In 1946 this provision was transferred from § 17 to § 31. 60 Stat. 956. As explained in S. Rep. No. 1392, 79th Cong., 2d Sess., p. 3, this transfer effected no substantive change in the Secretary's powers:

"Section 31 of the Mineral Leasing Act is amended to consolidate in that section various provisions of the act relating to termination or forfeiture of leases for default by the lessee, the substance of the existing law being retained in the amended section."

February 11, 1897, 29 Stat. 526. In 1909, confronted with a rapid depletion of petroleum reserves under this system, the President issued a proclamation withdrawing from further entry pending the enactment of conservation legislation upwards of 3,000,000 acres of land in California and Wyoming. In 1914 a mineral leasing bill passed both Houses of Congress but died in conference at the close of the session, see H. R. Rep. No. 668, 63d Cong., 2d Sess., and a mineral leasing program was considered by each subsequent Congress until the Mineral Leasing Act of 1920 was passed.

The committee reports reveal that one of the main congressional concerns was the prevention of an overly rapid consumption of oil resources that the Government, particularly the Navy, might need in the future. See H. R. Rep. No. 206, 65th Cong., 2d Sess. 5. Conservation through control was the dominant theme of the debates. See, e. g., H. R. Rep. No. 398, 66th Cong., 1st Sess. 12–13. The report on an earlier version of the bill that eventually became the Mineral Leasing Act stated:

> "The legislation provided for herein, it is thought, will go a long way toward . . . reserv[ing] to the Government the right to supervise, control, and regulate the . . . [development of natural resources], and prevent monopoly and waste and other lax methods that have grown up in the administration of our public-land laws." H. R. Rep. No. 1138, 65th Cong., 3d Sess. 19.

It would thus be surprising to find in the Act, which was intended to expand, not contract, the Secretary's control over the mineral lands of the United States, a restriction on the Secretary's power to cancel leases issued through administrative error—a power which was then already firmly established. See pp. 476–478, *supra*. More particularly, we can perceive no reason why Congress

should have given the Secretary authority to cancel administratively a prospecting permit (later a noncompetitive lease), § 26, 41 Stat. 448, on the basis of post-issuance events, but implicitly denied him that power in respect of pre-issuance occurrences.

The fragmentary excerpts of legislative history relied on by petitioner do not suggest an opposite conclusion. The comment that "the Secretary of the Interior has no right or authority under the bill to cancel a lease" was made in the course of a discussion on the floor of the Senate about lands on which there were producing wells in existence, and it was assumed that there had been a post-issuance violation of the terms of the lease; [9] the Secretary here claims no authority to cancel a lease in such a situation. The remark in the House debates that "there must be a showing made in court before the forfeiture can be secured" occurred in discussion relating to § 27 of the Act,[10] which is, as we have seen, a partial exception to the general scheme of forfeitures.

## III.

From the beginnings of the Mineral Leasing Act the Secretary has conceived that he had the power drawn in question here, and Congress has never interfered with its exercise.

The power was first invoked with respect to prospecting permits, as to which the statute authorized administrative cancellation only on the basis of post-issuance breach (note 8, *supra*, and accompanying text). See, *e. g., Leach* v. *Cornell,* No. A–1687 (unpublished departmental decision, Aug. 13, 1921); *McCarthy* v. *Son,* No. A–2398 (unpublished decision, Mar. 4, 1922); *Murray* v. *McNabb,* No. A–4412 (unpublished decision, Feb. 14,

---

[9] 58 Cong. Rec. 4168.

[10] 58 Cong. Rec. 7604.

1923); *Moon* v. *Woodrow,* 51 I. D. 118 (1925); *Drake* v. *Simmons,* No. A–16885 (unpublished decision, Oct. 28, 1932). Following the replacement of prospecting permits by noncompetitive leases in 1935 (note 8, *supra*), the same power was exercised with respect to them. See, *e. g., Fenelon Boesche,* No. A–21230 (unpublished decision, Feb. 21, 1938); *Reay* v. *Lackie,* 60 I. D. 29 (1947); *Iola Morrow,* No. A–27177 (unpublished decision, Oct. 10, 1955); *R. S. Prows,* 66 I. D. 19 (1959).[11]

Although the Act, as it relates to oil and gas leases, has been amended a dozen times in the last 40 years,[12] Congress has never interfered with this long-continued administrative practice. The conclusion is plain that Congress, if it did not ratify the Secretary's conduct, at least did not regard it as inconsistent with the Mineral Leasing Act. Cf. *Ivanhoe Irrig. Dist.* v. *McCracken,* 357 U. S. 275, 293; *Fleming* v. *Mohawk Co.,* 331 U. S. 111, 116; *Billings* v. *Truesdell,* 321 U. S. 542, 552–553.

## IV.

The present case is a peculiarly appropriate one for administrative determination in the first instance. At issue was simply the question whether petitioner's lease

---

[11] In *Melish Consolidated Placer Oil Mining Co.* v. *Testerman,* 53 I. D. 205 (1930), the First Assistant Secretary of the Interior stated that the "lease once granted was beyond recall by the Secretary and is only subject to cancellation in the Federal courts (Sec. 31, act of February 25, 1920)." This dictum, expressed with reference to a *competitive* lease, casts no doubt on the Secretary's uniform course of decision regarding permits and noncompetitive leases.

[12] See Act of April 30, 1926, 44 Stat. 373; Act of July 3, 1930, 46 Stat. 1007; Act of March 4, 1931, 46 Stat. 1523; Act of August 21, 1935, 49 Stat. 674; Act of August 26, 1937, 50 Stat. 842; Act of August 8, 1946, 60 Stat. 950; Act of June 1, 1948, 62 Stat. 285; Act of September 1, 1949, 63 Stat. 682; Act of July 29, 1954, 68 Stat. 583; Act of August 2, 1954, 68 Stat. 648; Act of September 21, 1959, 73 Stat. 571; Act of September 2, 1960, 74 Stat. 781.

offer was defective because it failed to include an adjoining 40-acre tract under application by another party, and this question had already been decided adversely to petitioner's position by the Secretary in a previous case interpreting the governing departmental regulations. *Natalie Z. Shell, supra.* Matters of this nature do not warrant initial submission to the judicial process. Indeed the magnitude and complexity of the leasing program conducted by the Secretary [13] make it likely that a seriously detrimental effect on the prompt and efficient administration of both the public domain and the federal courts might well be the consequence of a shift from the Secretary to the courts of the power to cancel such defective leases.

Recognition of the Secretary's power here serves to protect the public interest in the administration of the public domain. Cancellation of this kind of erroneously issued lease gives effect to regulations designed to check the undue splitting up of tracts, which might facilitate frauds, hinder the development of oil and gas resources, and render supervision very burdensome. See *Annie Dell Wheatley,* 62 I. D. 292, 293–294 (1955). In addition, exercise

---

[13] The Secretary, in his brief (pp. 12–13), informs us that on June 30, 1960, there were 139,000 outstanding leases supervised by the Department of the Interior under the Mineral Leasing Act, which covered 113,000,000 acres. The total number of outstanding leases supervised by the Department under all programs—public lands, acquired lands, Indian, Naval Petroleum Reserve and Outer Continental Shelf—was 159,000, covering 125,000,000 acres.

In many instances there are multiple applications for leases of the same land, sometimes hundreds for the same tract. For example, in a one-month period in 1961 there were 10,742 applications filed in the Santa Fe Land Office alone, many of which affected the same acreage. And in the three-year period ending June 30, 1960, there were 1,129 administrative cancellations out of the total of 54,000 leases issued during that period.

of the administrative power in cases of this type safe-
guards the statutory rights of conflicting claimants.

In the day-to-day operation of the Bureau of Land
Management, the managers of the local land offices act
on each lease application in chronological sequence. If
the land is available, if the applicant is qualified, and if
the application appears to conform to the regulations, a
lease will issue. In due course the manager will come to
conflicting applications for the same land. If a later
applicant is not the first qualified, his application will be
denied. The notice of denial will probably afford the
first occasion for an applicant to investigate whether he
was in truth the first qualified applicant, and to appeal on
this ground to the Director of the Bureau of Land Man-
agement and the Secretary of the Interior. Thus, given
the nature of the land office's business, the power of
cancellation, at least while conflicting applications are
pending, is essential to secure the rights of competing
applicants.[14]

We sanction no broader rule than is called for by the
exigencies of the general situation and the circumstances
of this particular case. We hold only that the Secretary
has the power to correct administrative errors of the sort
involved here by cancellation of leases in proceedings
timely instituted by competing applicants for the same
land.

In so holding we do not open the door to administrative
abuses. The regulations of the Department of the Inte-

---

[14] Petitioner contends that if an administrative cancellation pro-
ceeding is permitted to the Secretary, it would be imprudent for
a lessee, since his interest would thus be precarious, to assume the
financial risk of developing his lease, and therefore the effective term
of his lease would be curtailed even if he were finally held to be the
first qualified applicant. But the same delay—and perhaps even a
longer one—would result if the Secretary were remitted to judicial
proceedings for cancellation.

rior provide for adversary proceedings on appeals taken within the Department where other private parties will be affected by the decision. See generally 43 CFR, pt. 221. Appeal is of right, 43 CFR §§ 221.1, 221.31, the appellant is required to notify his opponent, 43 CFR §§ 221.4, 221.34, and the latter has full rights of participation, 43 CFR §§ 221.5–221.6, 221.35. And final action by the Secretary, see 43 CFR § 221.37, has always been subject to judicial review. 30 U. S. C. (Supp. IV, 1963), § 226–2; see, e. g., *Noble* v. *Union River Logging R. Co.,* 147 U. S. 165; *Moore* v. *Robbins, supra.*

We conclude that the judgment of the Court of Appeals must be

*Affirmed.*