Charles H. STEWART, Plaintiff,

v.

Gordon PENNY, individually and as Manager of the Reno, Nevada Land Office, Bureau of Land Management, U. S. Department of Interior and Dante Solari, individually and as District Manager, Bureau of Land Management, U. S. Department of Interior, Defendants.

Civ. No. 1619.

United States District Court
D. Nevada.

Feb. 26, 1965.

John Chrislaw, Minden, Nev., for plaintiff.

John W. Bonner, U. S. Atty., Las Vegas, Nev., Merlyn H. Hoyt, Asst. U. S. Atty., Reno, Nev., Thomas L. McKevitt, Dept. of Justice, Washington, D. C., for defendants.

THOMPSON, District Judge.

The inadequacy of our public land laws to afford reasonably workable methods, under present conditions, for the

acquisition of public lands by private citizens is a matter of growing national concern. It is of particular concern to the State of Nevada inasmuch as approximately eighty-five per cent of the area of this State (the seventh largest) is still in the public domain. Much of it has a valuable potential for private use. Yet the archaic federal land laws, enacted in an era of an agrarian economy, are ill-suited to an orderly disposition of the lands into private ownership. The laws were enacted with the laudable motive of enabling the penniless pioneer to acquire a home for himself and family primarily through toil and with little capital expenditure. That purpose was long ago achieved and most of the lands of the Western States which had a valuable agricultural potential, even if only marginally so, have been patented to individuals under the beneficent laws to the exclusion of the wealthy who, under a different policy, might have acquired large blocks of public lands by purchase. The inapplicability of this policy to modern conditions has, during the past quarter-century, accomplished a virtual deep-freeze of public lands in federal ownership. True, some small progress has been made under the Small Tract Act, laudable for its effort to dispose of public lands, but questionable insofar as it has clung to the concept of "proving up" the entry by requiring construction of minimum improvements, a policy which has resulted in shanty town like development of many areas opened to small tract entry.

The inertia of Congress in modernizing the public land laws has been a disservice not only to the public but also to the officials of the Bureau of Land Management who have been faced with the problem of applying archaic laws to present day problems of public land disposition. This is such a case.

On November 23, 1953, Charles E. Stewart, of Gardnerville, Nevada, filed an application for homestead entry upon the E½W½, Sec. 18, T. 19 N., R. 20 E. (160 acres) with the Reno Land Office of the Bureau of Land Management. A land status investigation determined that the SE¼SW¼ had theretofore been withdrawn as a highway material deposit site, and this portion, by amendment, was excepted from the application, reducing it to 120 acres. The remainder was included in a Taylor Grazing District, so the Land Office, acting pursuant to Part 296 of the Code of Federal Regulations, undertook to determine whether the land could properly be reclassified for homestead entry. On March 14, 1955, the Land Office made its decision, allowing the entry, and finding: "A field examination has been made and it has been determined that the land is more valuable and suitable for homestead entry than for the protection (sic) of native grasses and forage plants and accordingly the land is opened to entry." A specific condition of the entry was "Submission to the Manager, Land Office, Reno, Nevada, within 30 days of receipt of this notice, evidence of filing of a water permit application with the State Engineer, Carson City, Nevada, for the lands allowed. Failure to submit such evidence will subject this allowance to cancellation." Stewart complied with the condition.

Stewart thereupon took possession of the 120 acres, built a house, dug a well, developed the spring, built a small reservoir, cleared and cultivated land, and made other improvements. On January 14, 1959, Stewart filed his "Homestead Entry Final Proof", alleging that he had cleared and cultivated 15 acres in 1956–1957 and 5 acres more (20 acres total) in 1958, on which he had raised potatoes, sweet potatoes, onions and peanuts, and that he had constructed improvements at a cost of $3,970. Land examiners of the Bureau of Land Management examined the land and made an adverse recommendation which resulted in the initiation of a government contest to the application for patent. 43 CFR, Part 222. The contest complaint alleged:

"That the cited regulations require that 'during the second year not less than one-sixteenth of the area entered must be actually cultivated, and during the

third year and until final proof, cultivation of not less than one-eighth must be had;' and that for homestead entries on lands which are desert in character, there must be an available developed water supply sufficient to irrigate the acreage required to meet the cultivation requirement of the homestead laws.

"That the designated Contestee has not cultivated the required one-eighth of his entry, nor has he developed sufficient water to irrigate the required acreage of his HOMESTEAD ENTRY, Nevada 016595."

Stewart denied the charges and an administrative hearing was held April 5, 1960 before Hearing Examiner John R. Rampton, Jr.

At the outset of the hearing, Stewart moved that all charges relative to the insufficiency of water be dismissed upon the ground that the general Homestead Act, under which the entry was made, as distinguished from the Desert Land Act, required no proof of water, an issue which had been determined by the classification order of March 14, 1955. Decision on the motion was reserved and the hearing proceeded.

The Decision of the Examiner was filed August 11, 1960, and the adverse proceedings were dismissed. The examiner held (1) under 43 U.S.C. § 164, and 43 C.F.R., Part 166, governing homestead entries, no proof of water is required and this issue was foreclosed under the classification order of March 14, 1955, although the order may have been improvidently entered; and (2) the government had the burden of proof and it had not proved its charge that less than one-eighth of the entry (15 acres) had been cultivated by Stewart as required by the homestead laws and regulations. The government appealed the decision of the Hearing Examiner to the Director of the Bureau of Land Management. C.F.R. 222.13, 222.47, et seq.

On April 11, 1961, the Director reversed the decision of the Examiner.[1]

Now it was Stewart's turn to appeal, and he did so to the Secretary of the Interior. CFR 221.73, et seq. On Sep-

1. Director's Decision, 4/11/61:

"The evidence was conflicting as to whether the entryman had cultivated ⅛th of the land embraced in his entry as required by the Homestead Act, 43 U.S.C. 164. It is clear that because of lack of water, rodents and general poor husbandry the entryman has been plagued by crop failures and has not been successful in raising crops to fruition. The evidence is clear that the water now available to the homestead is but sufficient to irrigate about ½ acre thereof.

"The gravamen of this appeal is that the requirement of the cited regulation, 43 CFR 296.4, is a continuing one and since the entryman has insufficient water for the irrigation of 15 acres that his final proof is not satisfactory and that the entry must be canceled.

"At the outset we must note that the allowance of this entry in 1955 without requiring the entryman to show a water right sufficient to cultivate at least ⅛th of the land in the entry, or 15 acres, was erroneous. However, the fact remains that the entry was allowed under the general Homestead laws. Thereafter, in order to establish his right to patent, the entryman is required to show compliance only with the pertinent provisions thereof, 43 U.S.C. 164 and the applicable regulations, 43 CFR, Part 166.

"Nowhere in the statute or regulations is an entryman required to show that he has successfully raised a commercial crop; he is required to show an 'actual breaking of the soil, followed by planting, sowing of seed, and tillage for a crop other than native grasses.' 43 CFR 166.-23. However, improvements on the entry 'should be of such character and amount as are sufficient to show good faith.' 43 CFR 166.24. Evidence of good faith is a prerequisite to the earning of patent to a homestead. See *United States v. Cooke*, 59 I.D. 489, 504–505.

"The charge as made, although not in any wording of the statutory provisions, is sufficient to put in issue the good faith of the entryman.

"The testimony of the Government land examiners was to the effect that some acreage had been cleared. This was found by the hearing examiner to be in excess of 15 acres. The Government witnesses stated that they found only 1½ to 2½ acres cultivated as compared to that which was cleared. The entryman's evidence was to the effect that he had cultivated more than the minimum 15 acres but because of lack of water, ro-

-tember 25, 1962, the Assistant Solicitor, acting for the Secretary, affirmed the Director's Decision upon different grounds.[2]

dents and general poor husbandry his attempts at successfully raising a crop over the 15 acres were dismal failures.

"Surely, after once attempting to raise a crop the entryman was fully aware that further plantings, without the benefit of irrigation, would be abject failures. Even at the very moment of entry, he knew that any attempt at cultivation would be a failure unless he was able to and prepared to irrigate. Yet notwithstanding this knowledge he set about to create but an illusion of compliance with the positive mandates of the homestead law in regard to cultivation—knowing full well that such attempts at husbandry were foredoomed to disaster. And knowing that water was necessary for a successful operation it is indicated that no attempt was made to make water available to the homestead. This leads but to the conclusion that the entry including the maintenance thereof, although in ostensible compliance with the mandates of the homestead laws, lacks the good faith which is the primary ingredient for compliance therewith. Clearly, the character and amount of cultivation notwithstanding the amount of the cleared acreage wholly fails to satisfy the requirement of good faith on the part of the entryman. When viewed in this light, the evidence falls far short of demonstrating that the entryman complied with the cultivation requirements of the homestead law.

"Accordingly, the hearing examiner's decision is reversed and the entry is cancelled."

**2.** Secretary's Decision, 9/25/62:

"The ultimate question to be decided on this appeal is whether the homestead entry was properly canceled. Whether the land is, in fact, desert in character and whether the Secretary may allow a homestead entry on desert land are not in issue at this time. If the entryman had fully complied with the requirements of the homestead law, the cancellation was improper. If he had not complied, it was proper. He was charged with failing to cultivate ⅛ of the entry. The Appeals Officer did not decide whether the clearing, working of the soil and planting, which the entryman claimed to have done, extended to the required 15 acres of the entry but pointed out that, if so, the entryman failed to meet the cultivation requirement of the homestead law because he did not have a supply of irrigation water sufficient to support an inference that his efforts were calculated to produce profitable results considering the physical environment in which they were made and thus were not made in good faith.

"I think it is clear that a homestead entryman may not prove compliance with the cultivation requirement of the homestead law merely by showing that he broke the soil and planted something. If this were sufficient, homestead patents would be issued to entrymen who had gone through these motions on land suitable for the opening of a gravel pit and perhaps sought for that purpose. The different processes which comprise cultivation of the soil must include such acts and be done in such manner as to be reasonably calculated to produce profitable results. *Charles Edmund Bemis*, 48 L.D. 605 (1922). Therefore, if the land is arid or semiarid, cultivation which will meet the cultivation requirement of the homestead law must, of necessity, include the application of such amounts of water as may reasonably be required to produce a crop.

"In this case, the finding of the Appeals officer that Stewart did not meet the cultivation requirement of the homestead law because of his failure to develop an adequate water supply rests upon an implied finding that irrigation is an indispensable element of the cultivation of the land in the entry. The fact that it seems to have been regarded as desert land when the entry was allowed is some evidence of the necessity of irrigation. The entryman's efforts to bring spring water to his garden and his application of it to the garden and, to some extent apparently, to sowings of rye outside the garden area constitutes some additional evidence. But the record suggests that some of the land may have needed only supplemental water, in addition to subsurface percolation from the spring or fault area to which Stewart's supply pipe extended, to permit successful cropping. Certainly it is doubtful that there was an adequate water supply for even a limited need for water on ⅛ of the homestead entry. But I do not find that any of the crops planted died for lack of water. Hence, I am unable to find, on the basis of the evidence adduced at the hearing, that there was a total want of the type of cultivation reasonably calculated to produce profitable results. If this were the only pertinent factor in the case, it would be necessary to remand the case for the taking of further evidence. How-

The Secretary's decision is based upon an extensive analysis of the testimony and exhibits concerning the area cultivated by Stewart from 1956 to 1959.

Thereafter, Stewart filed this action for review of the administrative proceedings and final agency action. 5 U.S.C. § 1009.

## PARTIES

This action seeks review of a final decision by the Secretary of the Interior and prays for a reversal of his decision dated September 25, 1962 and of the Director's decision dated April 11, 1961. It also seeks to enjoin the named defendants from carrying out a threatened eviction of Stewart from the premises embraced within the homestead entry upon the grounds that the decision of the Secretary is against the law and the evidence. The only named defendants are Gordon Penny, described as Manager of the Reno, Nevada Land Office, Bureau of Land Management, United States Department of Interior, and Dante Solari, described as District Manager, Bureau of Land Management, United States Department of Interior.

■ In their Answer, the defendants alleged that the Secretary of the Interior is an indispensable party defendant. This is theoretically true, inasmuch as it is his final action which is being reviewed. This Court, nevertheless, clearly has jurisdiction to restrain threatened illegal action by subordinate officials of the Bureau of Land Management, the propriety of which rests upon the Secretary's decision. Adams v. Witmer (9 CCA 1958), 271 F.2d 29.

■ Under 28 U.S.C. § 1391(e), the Secretary might have been named a defendant in this action. In their pretrial memoranda, neither party referred to a defect of parties as an issue of law remaining in the case. Defendants have been represented throughout this case by the special attorneys in the Lands Division of the Department of Justice in the same manner as if the Secretary of the Interior had been a named defendant. The briefs to this Court have not mentioned a defect of parties. We conclude that any defense of defect of parties has been waived and this Court has jurisdiction to review the administrative proceedings and final agency action. To hold otherwise would be to substitute form for substance.

## SCOPE OF REVIEW

■ The Government has filed an excellent brief in which it argues, in part, that the decision of the Secretary finding non-compliance with the statutory requirements for valid homestead entry is conclusive and binding upon the courts,[3] citing Boesche v. Udall, 1963,

---

ever, I believe that this is unnecessary since, after a careful examination of the evidence, I am obliged to conclude that the entryman did not apply the processes of cultivation which he employed to the required ⅛ of the acreage of the entry so that he failed to meet the cultivation requirement of the homestead law for this reason."

3. Quotation from Government's brief:
   "In providing for disposition of the public domain under the generous provisions of the Homestead Act, the Congress made a number of specific requirements. One of these, the sole point involved here, is the requirement that a homestead entryman 'cultivate not less than one-sixteenth of the area of his entry, beginning with the second year of the entry, and not less than one-eighth, beginning with the third year of the entry and until final proof.' 43 U.S.C. sec. 164. Thus, the final proof that an entryman files, as the basis for an application for patent, must establish that the requisite cultivation has been effected. Whether this is true or not, i. e., whether the proper areas were cultivated, is a pure question of fact. If the Secretary accepts the proof, a patent will issue. However, the Secretary is the guardian of the public domain and the administrative officer who must, by law, determine whether the congressional directives have been complied with. If, as in this case, he concludes in the first instance that the issue is questionable, he will proceed under the contest provisions of 43 C.F.R. 1852.2-1 (formerly 43 C.F.R. 221.67). The sole point of such a proceeding is to give the entryman an opportunity to establish that he has complied with the requirements of the law. If he has not,

373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491; Best v. Humboldt Mining Co., 1963, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350; Cameron v. United States, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659. We recognize the peculiar and specialized knowledge of the officials of the Department of the Interior respecting the interpretation of the multifarious laws and regulations relating to public lands, and that Congress has entrusted the guardianship of the public domain to the Department of the Interior. We have relied upon that knowledge and expertise in reaching our conclusions. We cannot, however, accept without limitation a contention that a high administrative official in Washington, D. C. is better qualified than others to analyze and draw conclusive fact inferences from a cold record produced at an evidentiary hearing three thousand miles away and relating to physical conditions with which he has questionable familiarity, conditions normally deemed to be within the realm of judicial notice. We deem the correct rule of judicial review to be that enounced in Foster v. Seaton, 1959, 106 U.S.App.D.C. 253, 271 F.2d 836: "Thus the case really comes down to a question whether the Secretary's finding was supported by substantial evidence on the record as a whole." This is the only rule of judicial review which will breathe vitality into the mandate of Congress (Administrative Procedure Act, 5 U.S.C. § 1009[e]) that the reviewing court shall "hold unlawful and set aside agency action, findings and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of

the Secretary is not authorized to issue a patent. More importantly, however, the finding of fact on this point is one within the exclusive authority of the Secretary. This is not open to question."

an agency hearing provided by statute * * *."

■ The omnipotence of the Department of the Interior as guardian of the public domain is exhibited when the Department acts affirmatively and grants patents under the public land laws. The converse is not true. An entry or application for patent which is contested or rejected by the Secretary presents issues regarding the legal rights of the entryman under the public land laws. These are rights established by Congress which the Secretary of the Interior may not arbitrarily or capriciously ignore and which must be determined within the due process safeguards of the Administrative Procedure Act.

■ Subordinately, the Government argues that the hearing held on Stewart's application was not a hearing required by statute within the meaning of the Administrative Procedure Act and that the Act, therefore, does not apply. This we cannot accept. The Administrative Procedure Act applies to "each authority of the Government of the United States", not expressly excepted (5 U.S.C. § 1001). Adams v. Witmer, (9 CCA 1958), 271 F.2d 29, is direct authority for its applicability to the Secretary of the Interior.

## QUESTION OF ADEQUATE WATER

■ Stewart's final proof was contested upon the ground that "he had not developed sufficient water to irrigate the required acreage." No such requirement is found in the Homestead Act (43 U.S.C. §§ 162–4), or regulations (43 C.F.R. Part 166). Stewart's initial application was properly treated as a petition for reclassification of the lands described and the Land Office acted within the regulations in classifying the lands, which were desert in character, for entry under the general homestead laws (43 C.F.R. Part 296).[4]

4. "§ 296.4. Classifications of irrigable land for homestead entry. Public lands which are desert in character within the meaning of sections 2 and 3 of the desert-land law (act of March 3, 1877, 19 Stat.

In a well-reasoned discussion, the Hearing Examiner concluded that "once an applicant for a homestead entry has made a showing of a water right sufficient to justify a classification that the land is suitable for such entry and his entry is allowed, then the requirements of the homestead laws as set forth in 43 C.F.R. 166 govern and the Bureau of Land Management is precluded from again questioning the sufficiency of water." This conclusion was affirmed in the Decision of the Director of the Bureau of Land Management who said:

"At the outset we must note that the allowance of this entry in 1955 without requiring the entryman to show a water right sufficient to cultivate at least ⅛th of the land in the entry, or 15 acres, was erroneous. However, the fact remains that the entry was allowed under the general homestead laws. Thereafter, in order to establish his right to patent, the entryman is required to show compliance only with the pertinent provisions thereof, 43 U. S.C. 164 and the applicable regulations, 43 CFR, Part 166."

The Secretary impliedly agreed, holding:

"Whether the land is, in fact, desert in character and whether the Secretary may allow a homestead entry on desert land are not in issue at this time. If the entryman had fully complied with the requirements of the homestead law, the cancellation was improper. If he had not complied, the cancellation was proper."

We not only accept the administrative expertise in the interpretation and application of the Secretary's own regulations, but we believe the record cries for affirmance of these conclusions. Any other holding would be a fraud on the entryman, to whom it had been represented by knowledgeable local officials of the Bureau of Land Management after investigation and classification that the 120 acres were suitable for entry under the homestead laws. Such a finding represented final agency action unless appealed. 43 C.F.R. 296.9. This interpretation of the intent of the regulations applicable to this entry is confirmed by the more explicit regulations since promulgated (43 C.F.R. Parts 2410, 2411, secs. 2411.2, 2411.4, April 1, 1964 supplement). The administrative file in evidence shows that on April 9, 1955, Stewart wrote a letter to the Reno Office of the Bureau stating that he had filed for a water right as required by the classification order of March 14, 1955, and requesting: "Will you please send me complete literature on the rules and regulation governing the proving up of homesteads." The pencil note on the letter is, "file ltr in case—send: Hd Circ.". From this we infer the request was answered by sending the homestead circular, that is a reprint of Parts 166–9 of the regulations then in effect, i. e., the regulations governing homestead entries. As noted, these regulations contain no specific requirement with respect to water. We have considered Boesche v. Udall, 1962, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491, in which the Supreme Court sustains the right of the Secretary to reconsider and cancel an entry illegally allowed in the first instance. We believe it inapplicable to these facts. There the issue arose because of conflicting applications for the same land, and the administrative remedies were timely invoked by the rejected

377, 43 U.S.C. 322) and are subject to classification under section 7 of the Taylor Grazing Act may, on the filing of an application under the general homestead laws, be classified for entry under those laws, provided the applicant makes a satisfactory showing that the land is susceptible of successful cultivation by irrigation and that the cultivation requirements of the homestead laws will be met. The applicant in such a case will be required to furnish satisfactory evidence of a water right and plans of irrigation. The available water supply, and the plan of irrigation, however, need be sufficient only to enable the applicant to meet the cultivation requirements of the homestead laws."

applicants. Thus the issue of the legality of the contested oil lease was presented on direct review in a private contest. In our case, no Taylor Grazing permittee or other person having a right to use or enter upon the lands embraced in the homestead application contested the classification order of March 14, 1955, or appealed therefrom, and the order and finding that the land was suitable for entry under the general homestead laws attained the status of final agency action. The Secretary correctly concluded as a matter of law that the adequacy of water is not an issue in this case.

## GOOD FAITH

The Director of the Bureau placed his decision of April 11, 1961 upon the ground that the applicant had not shown good faith (Footnote 1). This was not an issue presented by the contest complaint. The Secretary discarded the issue of good faith, saying:

"Hence, I am unable to find, on the basis of the evidence adduced at the hearing, that there was a total want of the type of cultivation reasonably calculated to produce profitable results. If this were the only pertinent factor in the case, it would be necessary to remand the case for the taking of further evidence. However, I believe that this is unnecessary since, after a careful examination of the evidence, I am obliged to conclude that the entryman did not apply the processes of cultivation which he employed to the required 1/8 of the acreage of the entry so that he failed to meet the cultivation requirement of the homestead law for this reason."

The good faith requirement stems from 43 U.S.C. § 162 requiring the applicant to make oath "that such application is honestly and in good faith made for the purpose of actual settlement and cultivation, and not for the benefit of any other person, persons or corporation, and that he or she will faithfully and honestly endeavor to comply with all the requirements of law as to settlement, residence and cultivation necessary to acquire title to the land applied for." These basic requirements, with some elaboration, are restated in the regulations (43 C.F.R. 166.18). An appropriate statement of the meaning of good faith in this context is found in Carr v. Fife (CC Wash.1891), 44 F. 713:

"* * * whether he (the applicant) had actually, within the time limited by law, established his residence upon the land, with the intention of acquiring it for a home; whether he had continued to actually reside upon the land; whether he was really engaged in improving the land, or in good faith intending to do so; or whether he was only making a *colorable pretense* of residing upon and improving the land for the purpose of stripping it of its valuable timber, and acquiring it for *speculative purposes*, without complying with the terms of the homestead law." (Emphasis added)

The words "colorable pretense" and "speculative purposes" are operative and characterize the meaning of good faith in fulfilling the specific requirements of residence and cultivation under the homestead law. They refer to the intent and motive of the applicant.

In the light of what Stewart did on the land, it is inconceivable to this Court that there could be found the slightest semblance of an issue of good faith. He moved onto the entry with his wife and son, constructed a homesteader's house of three rooms, and lived there continuously to filing of final proof. He cleared over fifteen acres, cultivated the land, developed a spring, constructed a small reservoir, conducted the water from the reservoir to the cleared land by installing approximately 2,200 feet of metal pipeline, and purchased and used three pressure pumps and some 1,800 feet of plastic hose-pipe to irrigate the land by use of sprinklers. He dug a well near his residence, constructed other outbuildings, brought electric power to the property, and had a new home under con-

struction at the time of final proof. He was seventy-eight years old when final proof was filed, about four years after homestead entry was approved. There is not the least intimation that the land is valuable for anything other than grazing and agriculture, so there is no basis for speculating about "speculative purposes".

In United States v. Cooke, 59 I.D. 489, cited by the Director, the Secretary, in an exhaustive opinion dealing primarily with the good faith of a questionable residence, reversed the Commissioner and sustained the homestead entry on the premise that all that the entryman did "indicated purpose, determination, industry and good faith." This is true of Stewart. In Helen E. Dement, 8 L.D. 639, the Secretary again sustained a homestead entrywoman, stating: "It is right and proper to take into consideration the degree and condition in life of the entryman in determining whether the improvements show good faith." Citing the Dement case, the Department, in Kendrick v. Doyle, 12 L.D. 67, held:

"In the former contest it does not appear that there was any question about the house being on the land. This entryman is sixty-six years old and in infirm health and poor. He has made his living by raising goats and chickens on the land; he keeps from twenty-five to fifty goats on the tract. His improvements cost him about $100.

"In the case of Mary A. Taylor (7 L.D., 200), the proof showed no breaking of the land, but some cutting of grass for hay, and that the land was principally used for pasturage and that the entryman did not take the land for the purpose of tillage. It was said:—

"It (the proof) further shows that said tract is illy adapted for tillage and the raising of grain or other agricultural crops requiring the breaking and cultivation of the soil. But raising stock and grass is an agricultural pursuit, etc.

"The entry was passed to patent.

"In Helen E. Dement (8 L.D., 639), it was said:—

"It is right and proper to take into consideration the degree and condition in life of the entryman in determining whether the improvements show good faith.

"If it should be admitted that all the contestant claims is true, it would show the entryman, acting in good faith, built his house a little outside of the lines of his land, by a mistake that any one might have made; that he has maintained continuous residence and done the best he could, under the oppression and trespassing of the contestant and those acting in harmony with him, to make a living on the land and maintain his home there, and taking the case as it stands, I can not concur in your findings and judgment.

"Your decision is therefore reversed, and the contest dismissed."

That the homestead laws should be liberally applied in favor of the entryman is established by law and is not a matter of the whim or predisposition of the particular Secretary of the Interior who graces the office. The Supreme Court of the United States has established the principle. Ard v. Brandon, 1895, 156 U.S. 537, 15 S.Ct. 406, 39 L.Ed. 524:

"The law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon. If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights, and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application."

In Clements v. Warner, 1861, 24 How. 394, 16 L.Ed. 695, the Court said:

"The policy of the Federal government in favor of settlers upon public lands has been liberal. It

recognizes their superior equity, to become the purchasers of a limited extent of land comprehending their improvements, over that of any other person."

We cannot find in this record a scintilla of evidence pointing to lack of good faith.

## ACREAGE CULTIVATED

■ On the issue of the acreage cultivated, the Hearing Examiner stated that he could not find that 20 acres were cultivated, as alleged by contestee Stewart, but that "neither can I find that less than one-eighth of the entry (15 acres) was cultivated as alleged by contestant." The Examiner then volunteered the opinion that the burden of proof was on the Government. We do not agree. The Administrative Procedure Act imposes the burden of proof on "the proponent of a rule or order" (5 U.S.C. § 1006[c]). In our case, Stewart's Homestead Entry Final Proof, filed January 14, 1959, was an application for patent. Procedurally, the Contest Complaint filed by the Department was, in effect, an Answer to the Final Proof affirmatively specifying the alleged deficiencies. Procedure by way of a Contest Complaint is justified because the Final Proof is not in the form of a pleading and does not lend itself readily to a definition of issues by answer thereto. The procedural regulations then in effect (43 C.F.R. 221.73, 1961 Regulations) provided that on a hearing of a government contest, the contestant would first present his case. It does not follow therefrom that the burden of proof is on the government. The correct rule is stated in Foster v. Seaton, 1959, 106 U.S. App.D.C. 253, 271 F.2d 836, involving a mining claimant. The reasoning there expressed is equally applicable to a homestead entryman. The true proponent of the rule or order is the applicant for patent or other right to public lands claiming compliance with the public land laws. The government "bears only the burden of going forward with sufficient evidence to establish a prima facie case, and the burden then shifts to the claimant to show by a preponderance of the evidence that his claim is valid."

The Director, in his decision, interpreted the Examiner's finding with respect to acreage cultivated as a finding that in excess of fifteen acres had been "cleared". This Court considers it a finding, negatively expressed, that fifteen acres had been cultivated.

■ The Secretary deliberately restricted his reasons for affirming the cancellation of the entry to the finding: "The entryman *did not apply the processes of cultivation which he employed* to the required ⅛ of the acreage of the entry." (Italics added). This is the finding of the final agency authority which is subject to judicial review. If arbitrary and unsupported by substantial evidence and not in accordance with law, the decision based on the finding should be reversed.

■ The finding is based upon a very thorough and careful analysis of the testimony and surely is not arbitrary in the sense of being capriciously made without due consideration of the evidence. The finding, nevertheless, in our opinion, is unsupported by the evidence and was made without regard for the governing principle that the homestead laws should be liberally interpreted in favor of the entryman.

Most of the State of Nevada is rough, hard, dry country. Water is in short supply. The reclamation of this land for agricultural use is not easy, and the area here in question is of the kind described. The "processes of cultivation" which this entryman employed were suitable to the homestead. He intensively cultivated from one to two acres near his house, growing corn, potatoes, strawberries, sweet potatoes, peanuts and unions. He brought water to the area by pipeline and plastic hose for the irrigation of the produce. He cleared an additional thirteen to fourteen acres adjoining the garden plot and from one to three acres near the north boundary of the homestead. These areas he plowed, seeded to rye, harrowed and irrigated, by hose and

sprinkler, to the extent of his capacity and the resources available. On a portion of the land, he left windrows of sagebrush to stay erosion by prevailing winds, which were subsequently removed by bulldozer in 1958 and 1959.

The adequacy of the acreage involved in this activity is not open to substantial doubt. It was surveyed by a licensed civil engineer, a witness for Stewart, who surveyed 15.2 acres of cleared land in the larger parcel and 3.1 acres in the smaller. A registered surveyor for the Bureau of Land Management surveyed and located the boundaries of the 120 acre homestead entry and prepared a map (Exhibit R) on which he accurately located the reservoir, road, pipeline, well, houses and other improvements on the property, and the elevations and contour lines. The government surveyor did not testify. The map he prepared did not show the boundaries of the cleared area. These boundaries were superimposed thereon in pencil by a government land examiner who had used the "pacing" method of estimating boundaries and distances and estimated 12.5 acres in the larger cleared area and one acre in the smaller. The actual survey by a registered civil engineer must be given credence over an estimate of acreage based on pacing distances and boundaries.

Stewart testified by reference to an aerial photograph of the farm. It is true, as suggested by the Secretary, that there is some distortion of distances because of the perspective. Nevertheless, the cleared areas are obvious on the photograph, and are, by comparison, the same cleared acres surveyed by Stewart's surveyor. Stewart, by reference to the photograph, showed that he had cultivated and planted rye on over half the cleared area in 1956 and planted rye on the whole cleared area in 1957 and 1958. Mrs. Stewart testified that all the cleared area was in rye for the last three years. This testimony clearly supports a finding that the entryman did apply the processes of cultivation which he employed to the required one-eighth (15 acres) of the acreage of the entry.

The Secretary relied heavily upon the failure of other witnesses to testify positively to cultivation of the entire cleared acreage. In our view, their testimony strongly corroborates that of Mr. and Mrs. Stewart with respect to the employment of processes of cultivation on the homestead entry. It should not be expected that they could testify to a specific number of acres, or that they saw a crop growing on the entire area. Their testimony is not inconsistent with Stewart's claim of having plowed, seeded and harrowed the whole field. On the contrary, the testimony corroborates his claim to the extent that the witnesses did see, observe and remember. The presence of brush windrows on a portion of the land, later removed, does not detract from the cultivated area. Such windrows may be considered an aid to cultivation and were one of the processes of cultivation employed by the entryman. The careful analysis of the testimony made by the Secretary demonstrates that there is no substantial evidence to support a finding that the entryman did not apply the processes of cultivation which he employed to one-eighth of the entry.

The fact that Stewart's rye crop failed because of freezing, depredations by mice, rabbits and other rodents, and invasions of ranging livestock (the entry was unfenced) are irrelevant to this inquiry, except insofar as they account for the inability of some of the witnesses to see evidence of a rye crop at different periods of observation.

## CONCLUSION

We have related the administrative history of this case at some length. The varying approaches to decision adopted in the administrative heirarchy seem to us to stem from a basic feeling that the area was not properly classified for homestead entry. This may or may not be so. Perhaps it would have been more prudent to classify less than the entire 120 acres covered by the amended application as suitable for homestead entry. Once the entry was allowed, however, all

the entryman had to do was comply with the statutory requirements to be entitled to patent. The photographs, maps and testimony prove that he did so, taking into consideration "the degree and condition in life" of the entryman and the obstacles of nature and environment with which he contended.

The foregoing opinion dispenses with the need for separate findings and conclusions (F.R.Civ.P. 52). Plaintiff will prepare and submit an appropriate form of decree within ten days.