W. J. MURPHY, Appellant (Plaintiff),

v.

Eugene STEVENS, Appellee (Defendant).

Eugene STEVENS, Appellant (Defendant),

v.

W. J. MURPHY, Appellee (Plaintiff).

Nos. 5565, 5566.

Supreme Court of Wyoming.

April 23, 1982.

Rehearing Denied June 1, 1982.

John Burk, Casper, for W. J. Murphy.

William T. Schwartz and Cameron S. Walker of Schwartz, Bon, McCrary & Walker, Casper, for Eugene Stevens.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

This case arose out of an action by W. J. Murphy (Murphy) against Eugene Stevens (Stevens) for a determination that a partnership existed and that an accounting should be had. The trial court ruled that:

1. Murphy, Stevens, and Ralph Schauss (Schauss) were engaged in a partnership and that all properties in contention were partnership properties;

2. Proceeds from the McCoy Mountain project had already been distributed to the partners and need not be included in the accounting;

3. Stevens' motion for a new trial based on newly discovered evidence be denied;

4. Proceeds from the Penbar Mine project had already been distributed to the partners and need not be included in the accounting;

5. Murphy was estopped by laches from asserting an interest in coal permits, even though they were determined to be partnership assets; and

6. Murphy had also waived his right to assert any rights in the coal permits.

Schauss settled with Murphy and was, therefore, not a part of the suit for accounting. Stevens appeals from the first four rulings set out above. We affirm (1) that a partnership existed; (2) that proceeds from the McCoy Mountain project had already been distributed to the partners; and (3) that Stevens' motion for a new trial was properly denied. We will reverse the determination (4) that proceeds from the Penbar Mine project had already been distributed to the partners. Murphy appeals from the findings set out in (5) and (6) above that laches and waiver apply. We will reverse these findings.

I

Stevens contests the finding that a partnership existed. He specifically contests the finding that the Zig and Poe uranium claims were partnership property, and that the Mexican copper project was partnership property. At oral argument, Stevens' counsel also indicated that Stevens was appealing from the finding that the coal permits were partnership assets.

■ There is no automatic solution to the question of the existence of a partnership. *P & M Cattle Company v. Holler*, Wyo., 559 P.2d 1019 (1977). Section 17–13–201, W.S.1977, defines a partnership as an association of two or more persons to carry on as co-owners a business for profit. Section 17–13–202(a)(iv), W.S.1977, says that the receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business. The prima facie evidence can be rebutted by a showing that there was no intent to create a partnership, since intent of the parties is controlling. *P & M Cattle Company v. Holler*, supra. That intent, however, is the intent to do the things which determine whether a partnership relation exists. *Nelson v. Seaboard Surety Company*, 269 F.2d

882 (8th Cir. 1959). Persons who intend to do the things that constitute a partnership are partners whether their expressed purpose was to create or avoid the relationship. *Taylor v. Lewis*, Tex.Civ.App., 553 S.W.2d 153 (1977); and *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64 (1955).

■ On conflicting evidence, the question of whether a partnership exists is one for the trier of fact. *Pacific General Contractors v. Slate Const. Co.*, 196 Or. 608, 251 P.2d 454 (1952). A specific factual finding will not be disturbed unless the finding is clearly erroneous or against the great weight of the evidence. *Shores v. Lindsey*, Wyo., 591 P.2d 895 (1979).

■ In 1967, the parties orally agreed to enter into a business relationship. Murphy contended that the arrangement was a partnership; Stevens contended that the arrangement was for a joint venture, to be followed by other joint ventures if the arrangement worked out satisfactorily.

Murphy testified that they agreed to join each other in mineral exploration and development. Any consideration they received would be split equally three ways. They were also to split the expenses equally at an accounting each year, although the expenditures were initially to be carried separately. Each partner was to claim separate income tax deductions for his expenses. Schauss testified that the agreement was to share one-third, one-third, and one-third of profits and expenses on whatever properties were acquired, and that the partners generally had a meeting of minds before going in on new projects, although not always. He also testified that they discussed projects at their irregularly timed, informal meetings, and that during the association he felt he would have had an obligation to discuss proposed projects with Murphy and Stevens before he acquired anything in his own name. Stevens testified that he had never been in a partnership with anyone in his life. Stevens contends that Murphy and Schauss and he only "agreed to agree" on projects concerning uranium exploration and mining. There was sufficient evidence

for the trial court to find that a partnership existed. We will refer to the men as partners and to the business as a partnership in the rest of this opinion.

–A–

Although Stevens conceded that he engaged in joint ventures with Murphy and Schauss on other uranium claims, he argued that the Zig and Poe claims were staked after the three had agreed not to associate further on any projects. According to Schauss and Murphy, the partnership agreed to stop associating on any new projects after September 24, 1969. The claims were acquired on September 13, 1969, and December 26, 1969, respectively, by Schauss and Stevens working through a group of nominees.

The Zig and Poe claims were, however, a part of a Red Desert project, a continuous project that lasted over three years of staking uranium claims. They were in the same formation as the other Red Desert claims staked by the partnership. They were also in a geologic trend of uranium deposits, and were a continuation of previous stakings that Schauss was trying to establish in the Red Desert. Murphy testified that although the claims were staked in December, they were an extension of an earlier claim; Schauss testified that they agreed that projects still in progress would be completed if possible. There was ample evidence for the trial court to find that the Zig and Poe claims belonged to the partnership.

Stevens argues that if this court upholds the findings on the Zig and Poe claims, we should nevertheless reverse the trial court's award to Murphy of one-third of the number of shares of stock received by Stevens for the Zig and Poe claims. We will not address the argument, as it is unsupported by authority and without merit.

–B–

Stevens contends that since the Mexican copper project did not involve uranium, there was never any agreement among the three of them to participate in it. The evidence that we have already set out concerning the existence of this partnership and its terms also applies to the Mexican copper project. In addition, Murphy testified that before he went to Mexico he talked the project over with Stevens. Schauss testified that all three of them consulted on the Mexican copper project, and that Stevens was consulted at least twice and was in favor of the project.

–C–

Stevens next disputes the trial court's finding that certain coal exploration permits were partnership property. Early in 1968, according to both Murphy's and Schauss' testimonies, Stevens suggested that the partnership should acquire some coal prospecting permits. Murphy testified that the three of them had a "dozen or so" conversations about the coal permits. Stevens actually prepared permit applications in each of the partner's names, together with a coal permit in Nuclear Reserves' name, so that the partnership could acquire an entire area which would be four times as large as the area for which one individual could apply. The applications that Stevens prepared were both for Murphy in the name of Nuclear Reserves and in Murphy's name individually. Stevens then suggested that it would be futile to file the applications because the Bureau of Land Management was delaying issuance of prospecting permits. Both Murphy and Schauss testified that they did not file their permit applications because of Stevens' advice.

Sometime during the same year, Stevens filed coal permit applications in his own name for the same area. He said that he had prepared the permits for Nuclear Reserves, but had never prepared any applications for Murphy or Schauss. His testimony directly contradicted Murphy's and Schauss'. The question of the credibility of the witnesses is for the determination of the trial court which can best observe their demeanors. *Shores v. Lindsey,* supra. The trial court determined in this instance that Murphy and Schauss were to be believed, while Stevens was not.

We have considered that the parties here and Schauss may have entered into a scheme to defraud the government, and that perhaps *Kennedy v. Lonabaugh*, 19 Wyo. 352, 117 P. 1079 (1911), mandates that this court should not enforce such a contract. This would leave the parties where they placed themselves; that is, the coal interests would be left in Stevens. The facts of *Kennedy v. Lonabaugh*, supra, were different and can be conceptually distinguished from this case. In *Kennedy v. Lonabaugh*, supra, the partnership was formed for the illegal purpose of defrauding the United States of title to its coal land. For that reason, the court would not grant an accounting. The partnership here, however, was not formed for the purpose of carrying on an illegal business, nor was it formed for the purpose of conducting a lawful business in an unlawful manner.

It is true that the scheme proposed by Stevens was illegal. However, the scheme, which was only one of numerous partnership projects, was never carried out. When Stevens did finally apply for the coal permits, he applied for them in his own name. Murphy and Schauss did not even know that Stevens had applied for them, which was why they became disputed partnership property.

Furthermore, the illegal contract was never performed; the partners did not make the attempt to defraud the government. The coal permits which were applied for were applied for legally by Stevens in his own name, so that he could not have acquired leases on any more acres than those allowed to a single person. If Stevens had gone ahead and filed permits in the names of Murphy, Stevens, Schauss and Nuclear Reserves, then they might have been asking the trial court and this court to enforce an illegal contract.

We are talking about two separate agreements in this case. One of them was a legal agreement to form a partnership to carry on a legal business. The other was a proposed agreement to subvert government regulations, but that agreement was never carried out. Murphy asked the trial court to enforce the only agreement still in existence, which was the legal agreement to form and carry on a partnership.

Because there was no attempt to defraud the government and because the partnership contract which this court is enforcing was a legal one, we fail to see the applicability of *Kennedy v. Lonabaugh*, supra, to this case. That is not to say that we approve of the business methods of any of these men. They have been less than fastidious in their dealings with third parties and with each other. Nevertheless, their partnership agreement is a legal one which may be enforced by the courts.

The testimony and the facts brought into evidence and the history of the dealings strongly suggest that every transaction contested at trial was a part of a partnership. There was sufficient evidence for the trial court to find that a partnership existed and that the Zig and Poe claims, the Mexican copper project and the coal permits were partnership property.

## II

Stevens also appeals the trial court's finding that funds from certain projects had already been distributed to the partners and were not to be considered in the final accounting by the special master.[1] Specifically, he alleges that the findings that the proceeds from the Penbar Mine venture and from the McCoy Mountain project had already been distributed were unsupported by the evidence. When reviewing a sufficiency of the evidence question, the reviewing court will assume that the evidence in favor of the successful party is true, and will leave out of consideration any conflicting evidence presented by the unsuccessful party. *Madrid v. Norton*, Wyo., 596 P.2d 1108 (1979). The trial court's judgment must be sustained unless it is clearly erroneous or against the great weight of the evidence.

1. The parties agreed and the judge entered an order to bifurcate the trial. The issue of liability was decided at the first part of the trial; the questions of contribution and accounting were decided by a special master during the second part of the trial.

We hold here that evidence was sufficient for the trial court's finding on the McCoy Mountain proceeds, but that it was not sufficient to sustain the finding on the Penbar Mine proceeds.[2]

The evidence showed that the partnership had organized its business to achieve the best tax advantage, which involved having one of the partners individually stake the claims. Each partner would claim his individual expenses as deductions. They would then sell the property to Nuclear Reserves, the close corporation which the three of them controlled during most of the dealings and which was essentially a paper corporation. The corporation would usually issue its stock to all of the partners individually as consideration for the claims, regardless of who had staked the claims. The partners normally reserved individual royalties on each of the claims they sold to Nuclear Reserves.

Before any extensive development could take place, an outside company with adequate capital would have to be able to work the claims. The partners planned eventually to have a tax-free exchange of their Nuclear Reserves stock for stock of another such company. The outside company that was to do the developing would then own the claims, but the partners would own stock in that company. In this case, Petro-Nuclear, Ltd. (Petro), a publicly-owned company which had originally been owned by Murphy and later sold to Consolidated Oil, made an offer to Nuclear Reserves. As part of the offer, Petro insisted that it acquire what Murphy aptly called the loose-ends of the partnership and of the individual members of the partnership before it would acquire the Nuclear Reserves stock. The partners received 400,000 shares of Petro stock in exchange for the property included in the loose-ends transaction. They divided these shares unequally to account for royalties they had reserved on uranium claims, and to account for other properties they had acquired.[3] The partners then received more Petro stock when the tender offer transaction was completed. Each partner received Petro shares based on the number of Nuclear Reserves shares he owned at the time of the tender offer.

The loose-ends transaction was, then, a condition precedent to a tender offer by Petro to buy Nuclear Reserves stock and eventually to merge Nuclear Reserves into Petro. A letter of intent between Petro and Schauss, Murphy, and Stevens, as president of several corporations, said that the interests of the individuals which Petro was to acquire as a condition of the tender offer were the interests described in an attachment to the letter, called Exhibit A by Petro.[4] Exhibit A listed royalties the partners had reserved on claims they had already sold to Nuclear Reserves. It also listed properties that the partners had not sold to Nuclear Reserves. Apparently, Petro wanted to be sure that it bought any mineral assets related to the Nuclear Reserves assets, but which were still owned by the partners in their individual names. Only after Petro had acquired all these loose ends would it complete the tender offer to acquire Nuclear Reserves.

Exhibit B of Plaintiff's Exhibit 18 stated: "4. * * * Such tender offer [to Nuclear Reserves] shall also be subject to Petro's being able to acquire outstanding royalty interests and additional unpatented mining claims in accordance with the terms of paragraph 5 below.

"5. In addition to the proposed tender offer and as a condition thereof, Petro shall have consummated the acquisition by Petro from certain individuals of *roy-*

---

2. See Appendix A for what we understand from our reading of the record to be the organization of the businesses involved, especially as pertains to the loose-ends transaction.

3. Since Petro was going to acquire Nuclear Reserves after it acquired the loose-ends property, the claims and property from projects which had already been deeded into Nuclear Reserves were not a part of the loose-ends transaction.

4. Petro wrote a letter to the partners, which Murphy introduced as Plaintiff's Exhibit 18. The letter by Petro had two attachments, one which Petro called Exhibit A and one which Petro called Exhibit B. We will call them the same.

*alty interests and other interests owned by them in the properties* which have been discussed by the parties, which negotiations shall be conducted on the basis of Petro issuing to such individuals 400,-000 shares * * * of Petro." (Emphasis added.)

■ The McCoy Mountain project was listed by Petro on Exhibit A of Plaintiff's Exhibit 18 as one of the loose-ends properties. Murphy testified unequivocally that the McCoy Mountain property had been included in the loose-ends transaction and that the partners had received Petro shares in exchange for the McCoy Mountain property. The McCoy Mountain claims had never been deeded to Nuclear Reserves; they went directly into Petro Nuclear. The evidence, then, does support the trial court's conclusion that the McCoy Mountain property was distributed in the loose-ends transaction.

The Penbar Mine claims are, however, a different story. Murphy had already deeded the claims to Nuclear Reserves. With the approval of Schauss and Stevens as Nuclear Reserves directors acting at a board meeting, Murphy had received 85,000 shares of Nuclear Reserves as consideration for the Penbar shares. Murphy's testimony on Penbar, unlike his testimony on McCoy Mountain, was equivocal. He first stated that he did not think the Penbar stock had yet been distributed. He then said that he thought it had been distributed in the loose-ends transaction because he took less stock there than did Schauss or Stevens. He also said that he would leave the matter open and that it was available for the accounting.

The partners as shareholders of Nuclear Reserves received Petro stock from the tender offer in proportion to their shareholdings in Nuclear Reserves, in addition to the shares which they had received in the loose-ends transaction. Murphy testified that it was impossible in the loose-ends transaction to try to attribute specific shares to specific properties, but that he had not shared the Petro stock which he had received in the tender offer from Petro.

He later contradicted himself and testified that Stevens had already received his consideration for the Penbar Mine as it accrued to Nuclear Reserves and Petro. Opposing counsel then asked him:

"Q. And, of course, as those shares of stock went to you in your name alone.

"A. Unless, of course, the accounting shows that we evened that up in the loose ends transaction."

Petro had apparently tried to use a ratio to divide the shares of its stock among Murphy, Stevens, and Schauss, as a way to settle the loose-ends transaction and as a way to have something to show in its records. Murphy said several times that all three partners objected to Petro's allocation of a certain number of shares to each person for each property listed in Exhibit A, because it didn't demonstrate the truth of the transactions or the equities involved. He also agreed with his counsel that it could possibly affect whatever had been done with exploration costs on his personal income tax returns. He asserted that Petro's proposed ratio of share division was not binding on the partnership, as suggested by Stevens' counsel on cross-examination. The record does show, however, that the ratio of share division eventually arrived at by Murphy, Stevens, and Schauss for the stocks received in the loose-ends transaction is exactly the ratio which was proposed by Petro.

In the face of conflicting evidence, this court must regard only the evidence most favorable to the successful party on appeal, together with all fair inferences which may reasonably be given it. *Madrid v. Norton,* supra. In this case, however, the evidence which would normally be favorable to the successful party is refuted by the very witness offering it to such an extent that we cannot characterize it as favorable, and the only fair inference which may be reasonably drawn is that the partnership was satisfied with Petro's proposed ratio, but that the partners just did not want any written record of how the division was made or what properties were to be included in the division. The rule relating to conflicting evidence does not:

" ' " * * * relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence. * * * " ' " *Steadman v. Topham*, 80 Wyo. 63, 338 P.2d 820, 825 (1959).

█ If Murphy was to succeed in proving that Penbar had been included in the loose-ends transaction, he should at least have given testimony which was much less equivocal, both during his direct testimony and during his cross-examination. He never definitely stated that Penbar had been included in the loose-ends transaction; he twice indicated that if it had not already been taken care of, then Stevens was entitled to a share. He presented no documentary evidence of the loose-ends transaction other than Exhibit A of his Exhibit 18, which had been prepared by Petro. He testified that Exhibit A generally showed the properties that Petro was to acquire in the loose-ends transaction. Exhibit A did not list the Penbar property, and Murphy never said that Exhibit A was an incomplete list of the loose-ends properties. The Penbar properties had already been deeded to Nuclear Reserves, while none of the properties listed on Exhibit A had been. We conclude that the finding that Penbar Mine proceeds had been divided up in the loose-ends transaction was against the great weight of the evidence.

### III

After ruling that the coal permits were partnership property, the trial court found that Stevens had been impaired in his ability to defend the lawsuit and that the doc-

trine of laches should apply. Murphy, therefore, was not to receive any of the value of the coal permits.

The facts leading to this ruling are rather complicated.[5] See Appendix B for our understanding of the relationship involved in the part of this litigation pertaining to the coal permits.

The partners decided they would terminate the partnership when the Nuclear Reserves merger with Petro became final, which was on September 24, 1969. Murphy anticipated that he would become the president of Petro until it was merged with yet another larger company to allow still more development.[6] Stevens and Schauss were to become major shareholders in Petro and perhaps also become directors. Murphy felt that continuing the partnership would pose a potential for conflict of interest, since Petro was a public company and could not be treated like just another arm of the partnership as Nuclear Reserves had been.

In 1971, Murphy was indeed president of Petro; Schauss and Stevens were on the board. Petro sold some of its uranium claims to a company called Pollution Control and Engineering, Inc., (Pollution Control) in exchange for Pollution Control stock. Pollution Control had been formed by Stevens and Schauss after the partnership had decided to wind up. Apparently no one thought there was any self-dealing involved, although the relationship of these men and their close corporations and the public corporation might seem indiscreetly and perhaps illegally intimate to a minority shareholder.

In connection with the Petro sale of its uranium claims to Pollution Control, Schauss made a financial presentation to Petro that included references to Stevens' coal permits. Stevens in 1970 had entered

---

5. Murphy, Stevens, and Schauss need never worry about unemployment. If they tire of being entrepreneurs and presidents of numerous companies, they could always become script writers for *Dallas*, in charge of a division creating J.R.'s latest business machinations.

6. As the development expanded, larger and more adequately financed companies were needed. The same sort of arrangement would be worked out between Petro and a larger company as had been arranged between Nuclear Reserves and Petro.

into an option agreement with Pollution Control to sell the coal permits to the company, and Pollution Control (basically Stevens and Schauss) looked upon the coal permits as an asset of the company. Murphy testified that at the time of the presentation in 1971, he recognized the permits as the ones which Stevens had originally offered to the partnership.

Sometime later, Petro-Nuclear merged with Silverbell Industries, a now-public company which Stevens and Schauss had originally owned before their partnership with Murphy.[7] Murphy was once more a president without a company, but not for long. In 1974, he became president of Pollution Control. Schauss testified that he had felt that Murphy could do a better job of running the company because there was a lot of internal dissension, apparently between Schauss and Stevens. Stevens was refusing to perform the option agreement with Pollution Control, and Murphy's first major duty as president of Pollution Control was to force Stevens to comply. He had Pollution Control start a lawsuit to that end. Both sides of the lawsuit were eventually bought out by Western Fuel Reserves, which seems to be the only company mentioned in this suit that neither Murphy, Stevens nor Schauss was involved in at some time.[8] Murphy participated in the negotiations to settle the suit on behalf of Pollution Control. That suit was settled, and in 1975 Murphy started this action against Stevens.

Murphy never mentioned for the record at any shareholder or board meeting of Pollution Control that he felt he had a personal interest in the coal permits. He waited nearly four years after he had knowledge that Stevens was claiming the coal permits to file an action for an accounting, by which time the coal permits had become very valuable.

■ Laches is a form of equitable estoppel based on an unreasonable delay by a party in asserting a right. The party asserting equitable estoppel as a defense must show that he lacked knowledge of the facts or was without the means of discovering them. The party asserting laches or equitable estoppel must also show that he relied upon the plaintiff's actions and changed his position in reliance thereon to his prejudice. " ' * * * Unless the delay has worked injury, prejudice or disadvantage to the defendants or others adversely interested, it is not of itself laches. * * * ' " *Hartnett v. Jones*, Wyo., 629 P.2d 1357, 1364 (1981).

The burden is on the one who asserts laches to prove prejudice. *Pickett v. Associates Discount Corporation of Wyoming*, Wyo., 435 P.2d 445 (1967). Here, Stevens introduced no testimony and never indicated in any way that he was prejudiced in his inability to defend this suit because of Murphy's delay. If the facts which supposedly establish the estoppel are uncontested, the decision whether equitable estoppel should apply is a question of law. *United States v. Millsap*, 208 F.Supp. 511 (D.C.Wyo. 1962).

Here, the testimony was uncontradicted that Stevens was the bookkeeper for the partnership. The coal permit applications were still in existence and were admitted into evidence. The record also shows that Stevens deposed out-of-state witnesses and cross-examined Murphy's witnesses extensively. Stevens testified adamantly to his version of the facts. Indeed, the ruling as to laches is incongruous. One would assume that if Stevens were prejudiced in his

---

7. This is the type of transaction referred to in fn. 6.

8. Once again, we are reminded of the intrigue of *Dallas*. Sue Ellen is married to J.R., but is seeing Cliff Barnes, her sister-in-law's brother. Then, Sue Ellen stops seeing Cliff Barnes and starts seeing an old friend who had been a college sweetheart in the pre-J.R. era. His existence on the program was so short that his fictional name eludes us, much like some of these companies. After that liaison, Sue Ellen forms yet another, while still being officially associated with J.R., et cetera, et cetera. Any further delineation of the facts here or in *Dallas* would just add to the confusion.

ability to defend against Murphy's assertion of rights in the coal permits, then he would also have been prejudiced in his ability to defend all other aspects of the suit.

Stevens did allege affirmatively in his answer that laches should apply because he had been prejudiced by the fact that Murphy waited until the coal permits had dramatically increased in value before he asserted any right in them. He implied on appeal that he had taken the risk of developing the coal permits while Murphy sat idly by waiting to grab the benefits without having subjected himself to any possibility of loss. Courts look upon such actions with disfavor:

> " * * * There is an inherent injustice in one purportedly holding a right to assert an ownership in property to voluntarily await the propitious event and then decide, when the danger which has been at the risk of another is over, to come in and claim a share of the profits. [Citation.]" *Madrid v. Norton*, supra, at 1120.

That, however, is not what happened here. The standard procedure for coal exploration by individuals is that a person applies for a prospecting permit, as Stevens did. If the permit is granted, the person making the application also gets a license to carry out an exploration program to determine if commercial quantities of coal exist. After submission of a geologic report by the prospector, the United States Geological Service (U.S.G.S.) determines if there are commercial quantities of coal. If so, then the prospector is entitled to a preference-right lease.

The permits here were granted to Stevens in 1970. He then entered into an option agreement to sell them to Pollution Control. Schauss arranged a personal line of credit to raise the money for Pollution Control to pay Stevens the remainder of what it owed him. Pollution Control carried out the exploration on the property, even though the permits were still in Stevens' name. Pollution Control had already forwarded the geologic report to the U.S.

G.S. before the lawsuit between Pollution Control and Stevens started. Before Western Fuels would buy out the lawsuit, Pollution Control had to make certain that the U.S.G.S. had determined that commercial quantities of coal had been discovered. Murphy took care of that by making many personal visits to the government people involved. It appears that he was largely responsible for seeing that the U.S.G.S. approved the geologic report.

Stevens was never at any personal monetary risk. He contested none of the facts here, and presented no evidence that he had or would have received a better offer from Western Fuels had it not been for the lawsuit. It is questionable whether Stevens could even have legally sold the permits to Western Fuels. Whether Murphy first handled the lawsuit by Pollution Control or whether he had instead started a suit for a partnership accounting, Western Fuels would have been on notice either way that the ownership of the coal permits was contested. If we agreed with the trial court that Murphy was estopped to assert his interests in the coal permits, we would be saying that the only two people who would receive any benefit from the approval of the report by the U.S.G.S. and the sale of the lawsuit to Western Fuels would be Schauss and Stevens, who were both major stockholders in Pollution Control. One cannot reasonably infer that Murphy would work so steadfastly and diligently to derogate his own interests.

In addition, Murphy's testimony is also uncontradicted that he made several efforts before the Pollution Control lawsuit to settle his accounts with Stevens, and that these efforts included his claim to rights in the coal property. Stevens had the burden of proof here. The proof offered to show laches must be certain in every particular with nothing left to inference. Failure to prove any one of the elements is fatal. *Barfield v. Howard M. Smith Company of Amarillo*, Tex., 426 S.W.2d 834 (1968). By not presenting any conflicting evidence,

Stevens failed to prove he lacked the knowledge that Murphy would be asserting a right to the coal permits, the proof of which was essential to his affirmative allegation of laches.

██ Stevens was not prejudiced in his defense of the suit, nor did he put his money at risk in a speculative venture while Murphy waited to see if there really were any commercial quantities of coal. He also failed to prove lack of knowledge. We find as a matter of law that the doctrine of laches does not apply.

## IV

██ The trial court also found, based on Murphy's actions as president of Pollution Control, that he had waived his right to assert any interest in the coal permits. The elements of waiver are that plaintiff has an existing right, knowledge of that right, and an intent to surrender or relinquish the right. *In Re Estate of Boyd*, Wyo., 606 P.2d 1243 (1980). Waiver differs primarily from laches in that laches requires a showing of prejudice to the party claiming it; waiver does not.

██ The burden of proving waiver, an affirmative defense, is on the party asserting it. Stevens had to show that Murphy intended to relinquish a right, although the intent may be implied. Murphy's testimony was that he made several efforts before the Pollution Control lawsuit to settle his accounts with Stevens, and that those efforts included an assertion to rights in the coal property. That testimony, standing uncontradicted, does not show an intent to waive a right. While the necessary intent for waiver may be implied from conduct, the conduct should speak the intent clearly. *Bankers Trust Company v. Pacific Employers Insurance Company*, 282 F.2d 106 (9th Cir. 1960), cert. den. 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961). Waiver must be manifested in some unequivocal manner. *Ranger Insurance Company v. Cates*, Wyo., 501 P.2d 1255 (1972).

██ We think that the nonconflicting evidence here admits of only one conclusion, and a contrary conclusion cannot stand. *Wyoming Farm Bureau Mutual Insurance Company v. May*, Wyo., 434 P.2d 507 (1967). Even if the evidence here did justify either of two reasonable inferences, this court will reverse the finding if it can say, as a matter of law, that the inference in favor of the party which did not have the burden of proof was more, or at least equally, probable. *Bocek v. City of Sheridan*, Wyo., 432 P.2d 893 (1967). We find that the inference in favor of Murphy that he did not intend to waive his interests in the coal permits is at least equally as probable as the inference that he did intend to waive his interests, and therefore reverse the finding of waiver.

## V

Stevens also appeals from the denial of a motion for a new trial based on newly discovered evidence. The trial court had originally found that the Clear Creek mining project was part of the partnership. Stevens wanted a new trial because a document signed by Murphy which had been in Murphy's possession until the accounting proceedings by a special master represented that Murphy owned Clear Creek stock in his own name and did not intend to divide his participation with others. It also said that Murphy was not acquiring the stock in connection with any offering or distribution. Stevens based his motion for a new trial on that document.

██ It is within the sound discretion of the trial court to grant or refuse a motion for a new trial based on the discovery of new evidence, and the trial court cannot be challenged except for an abuse of discretion. The party who asks for a new trial on the ground of newly discovered evidence must satisfy the court that the evidence has come to his knowledge since the trial and could not with due diligence have been found sooner. He must also prove that the evidence does not speak to facts related to

evidence already presented at trial, and that the evidence is so material that it would probably produce a different verdict if the new evidence were granted. *Opie v. State*, Wyo., 422 P.2d 84 (1967).

■■■ The evidence here was related to evidence already presented at trial. Murphy stated in his deposition that he held the shares in his own name, although he held them for the benefit of the partnership. He also said that the shares of stock did not state that he held them for the benefit of the partnership.

The evidence was also not so material that it would produce a different judgment. Schauss testified that all three of them agreed to go in on the project, that he took a trip to Colorado to look at the property, and then came back and told Stevens about it. These men demonstrated several times that what they put on forms to satisfy regulatory agencies and fulfill the letter of the law had no bearing on how they actually conducted their business.

We therefore affirm the trial court's denial of a motion for a new trial. We also affirm the findings that a partnership existed and that the proceeds from the McCoy Mountain project had already been distributed. We reverse the trial court's finding that the proceeds from the Penbar Mine project had been distributed, together with the findings that laches and waiver apply to bar Murphy from asserting and receiving any interest in the coal permit proceeds.

This case is affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.

## Appendix A

The Partnership Projects:

1. These Red Desert uranium claims were sold by the partnership, through the individual in whose name they were held or staked to Nuclear Reserves, Inc., in exchange for Nuclear Reserves stock:
   SNS, SMS, RE, BULL, PORK CHOPS, HOTS, H, MATS, K, RIM, DM, B, BECKY, POT, ROB, GEM, BOTTLE
   (Partners usually reserved a royalty on each claim.)

2. Mexican copper concessions to NRI, but partners receive no stock.

3. Clarkson Hill claims go to NRI from Murphy & Schauss in exchange for NRI stock. Murphy & Schauss receive stock and reserve a royalty; Stevens declines offer to participate.

4. Penbar claims go into NRI from Murphy; NRI stock goes to Murphy, with Stevens' and Schauss' approval.

**NUCLEAR RESERVES, INC.**
(Murphy, Stevens, & Schauss)
Red Desert claims become NRI property.

NRI stock to Murphy, Stevens, & Schauss.

Mexican copper concessions become NRI property.

Clarkson Hill claims become NRI property.
NRI stock to Murphy & Schauss.

Penbar claims become NRI property.

NRI stock to Murphy.

**THE TENDER OFFER:** Petro Stock to: NRI shareholders. Murphy, Stevens, & Schauss receive Petro stock based on the amount of NRI stock each held. — All of NRI's properties

Loose-end properties owned by Murphy, Stevens & Schauss and conveyed to NRI:

1. The royalties reserved by the partners when they sold claims to NRI on:
   JV, Poison Spider,
   Red Desert, AB,
   Clarkson Hill, McCoy Mtn.

2. Other property not owned by NRI:
   Ox Flat, Sandy, Windriver Frye, and McCoy Mtn. claims.

The partners split the Petro stock:

Schauss gets 191,304
Stevens gets 118,261
Murphy gets  90,435

**PETRO–NUCLEAR, LTD.**

1. Originally formed by Murphy before the partnership. Murphy sold it.

2. Petro a public corporation at time of loose-ends transaction and tender offer to NRI.

3. Loose-ends transaction on September 15, 1969. Petro pays 400,000 of its shares in exchange for the loose-end properties.

4. Petro tender offer to NRI on September 24, 1969.

5. Murphy becomes president of NRI. Murphy, Schauss, & Stevens become members of the board of directors.

# Appendix B

## A "Geneology"

**THE INDIVIDUALS**

1. Owned properties and claims.

2. Owned royalties on claims owned by partnership, until sold to Petro in loose-ends transaction.

3. Owned royalties on claims sold to NRI, until sold to Petro in loose-ends transaction.

4. Owned stock in Petro from loose-ends transaction.

5. Owned stock in NRI until tender offer by Petro.

6. Owned stock in Petro based on proportion of stock ownership of NRI.

7. Schauss & Stevens owned shares of Pollution Control.

8. Schauss, Stevens, & Murphy owned shares of Fremont Energy.

---

Murphy, Stevens, & Schauss

**THE PARTNERSHIP:**

1. Murphy, Stevens, & Schauss 1967–1969.

2. Own Red Desert & McCoy Mtn. uranium claims, Penbar Mine fluospar claims, Clear Creek gold claims, Mexican copper concessions, and coal permits filed by Stevens.

Sold some of these to NRI.

---

Murphy, Stevens, & Schauss

**NUCLEAR RESERVES, INC.**

1. A close corporation originally formed by Murphy

2. Basically run by Murphy, Stevens, and Schauss during the time of the partnership.

---

**PETRO–NUCLEAR, LTD.**

1. Originally owned by Murphy, who sold it to Consolidated Oil before the partnership

2. A public corporation.

3. After the tender, offer, Murphy becomes president; Schauss, Stevens, and Murphy become members of the board.

4. Petro owns all the loose-end properties.

5. Petro owns what used to be NRI.

6. Petro owns PCE stock.

---

**SILVERBELL INDUSTRIES**

1. Originally owned by Stevens & Schauss, who sold it to Silverbell.

2. Silverbell a public corporation.

3. Silverbell owns all of what used to be Petro.

4. Murphy is a stockholder, but is no longer president and has no part in management.

---

Stevens
Purports to own coal permits.

Stevens & Schauss

**POLLUTION CONTROL & ENGINEERING, INC.**

1. Formed by Stevens and Schauss post-partnership.

2. Schauss as president of PCE enters into option agreement with Stevens. Stevens to sell coal permits to PCE.

3. PCE sells some of its stock to Petro Major asset of PCE is the coal permits.

4. Murphy becomes president at Schauss' request.

5. Murphy as president of PCE sues Stevens to get performance of option agreement.

6. Western Fuels buys out the lawsuit. Stevens gets money from Western Fuels; PCE (Stevens & Schauss) gets money from Western Fuels.

7. The Zig & Poe claims had been deeded by Schauss & Stevens to PCE.

---

**FREMONT ENERGY CORPORATION**

1. Used to be PCE.

2. Murphy, Stevens, & Schauss are all shareholders.

3. Murphy is president at time of suit for accounting.

THOMAS, Justice, specially concurring and dissenting.

I concur in the holdings of the majority opinion with respect to Case No. 5566, which is the appeal by Eugene Stevens. Those holdings are that the determinations by the district court are correct except for its determination that the proceeds from the Penbar Mine project already had been distributed to the partners. I must dissent, however, from the disposition made by the majority opinion with respect to Case No. 5565, the appeal by W. J. Murphy. I have no real quarrel with the recitations made in the majority opinion as to the law with respect to waiver and laches. Recognizing that the district court may have premised his ruling upon an erroneous ground, we still can affirm his judgment upon any proper ground appearing in the record. *Agar v. Kysar*, Wyo., 628 P.2d 1350 (1981); *Wightman v. American National Bank of Riverton*, Wyo., 610 P.2d 1001 (1980), and cases therein cited. In my opinion the disposition made by the district court represents a sound sense of propriety and should be affirmed.

With respect to these coal permits, the majority opinion states as follows:

" * * * Early in 1968, according to both Murphy's and Schauss' testimonies, Stevens suggested that the partnership should acquire some coal prospecting permits. Murphy testified that the three of them had 'a dozen or so' conversations about the coal permits. Stevens actually prepared permit applications in each of the partner's names, together with a coal permit in Nuclear Reserves' name, so that the partnership could acquire an entire area which would be four times as large as the area for which one individual could apply. * * * "

This language in the majority opinion describes a scheme to evade the acreage limitations set forth in the Code of Federal Regulations; the regulations relating to qualifications of applicants; and the regulations relating to applications for permits. 43 C.F.R., Ch. II, §§ 3131.1, 3131.2, 3132.-2(a)(1), (2), (5), and (b), and 3133.3 (Jan. 1,

1967 Rev.). It would appear that such permits would be subject to cancellation by the United States of America because of these violations. 43 C.F.R., Ch. II, § 3133.5(c) (Jan. 1, 1967 Rev.); *Boesche v. Udall*, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963). The record discloses the expertise of the parties with respect to the mineral leasing rules and regulations of the United States, and that the scheme of the evasion was purposeful.

I cannot agree with the conclusions in the majority opinion as to the legality of this arrangement. Murphy described the scheme in his testimony and stated that he knew that Stevens had applied for a coal permit in his own name. The admitted purpose of applying in the several names was to avoid the acreage limitations. The majority position has to assume that Stevens' application was on behalf of the partnership. One applicable requirement of the Code of Federal Regulations reads as follows:

"(a) No specific form is required, but the application should cover the following points:

"(1) *The applicant's name* and address." (Emphasis added.) 43 C.F.R., Ch. II, § 3132.2 (Jan. 1, 1967 Rev.).

If the permit was intended to be partnership property then the regulation required that it be applied for in the name of the partnership, and in other parts it required a disclosure of the partnership. Since it did not do that the application was false.

Another applicable regulation reads as follows:

"(e) Every applicant for lease or permit must submit at the time of filing a signed statement that he is the sole party in interest in the application and the lease or permit, if issued; if not, he shall set forth the names of the other interested parties. If there are other interested parties in the application, a separate or joint statement must be signed by them and by the applicant setting forth the nature and extent of the interest of each in the application, the nature of the agreement between them, if oral, and a

copy of such agreement if written. Such separate or joint statement of interest and written agreement, if any, or a statement of the nature of such agreement, if oral, must accompany the application. Simultaneously, all interested parties must furnish evidence of their qualifications to hold such lease interest or permit." 43 C.F.R., Ch. II, § 3131.2(e) (Jan. 1, 1967 Rev.).

In its failure to comply with the requirements of this regulation Stevens' application also was false.

Still another applicable regulation reads as follows:

"18 U.S.C. 1001 makes it a crime for any person knowingly and wilfully to submit or cause to be submitted to any agency of the United States any false or fraudulent statements as to any matter within its jurisdiction." 43 C.F.R., Ch. II, § 3001.-0-7 (Jan. 1, 1967 Rev.)

This record discloses by the testimony of the parties not only an agreement to conduct their business unlawfully, but specific illegal acts in an effort to accomplish that purpose.

The parties' scheme "constituted a conspiracy to defraud the United States of the title to its coal land and any act in furtherance of such conspiracy would constitute a criminal conspiracy and a crime." *Kennedy v. Lonabaugh*, 19 Wyo. 352, 117 P. 1079, 1081, Ann.Cas. 1913E, 133 (1911). In *Kennedy v. Lonabaugh*, supra, this court held that a court of equity has a duty to determine the character of the contract which it is called upon to enforce or the profits of which it is asked to distribute as disclosed by the evidence, even though the illegality or its validity as being in violation of the law is not raised by the pleadings. The court further held that a court of equity will not lend its aid to enforce the perform-

ance of a contract which is contrary to public policy or contrary to the law of the land, but will leave the parties in the plight in which their own illegal action has placed them. Summarizing the matter, this court said at 19 Wyo. 376, 117 P. 1087–1088:

"It is a principle which controls courts of equity in the administration of justice that he who seeks their aid must do so with clean hands—that he cannot make his iniquitous act the basis of equitable relief. To decree a division of the profits of this contract would be in substance to enforce an illegal contract. *McMullen v. Hoffman*, supra [174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1899)]. The lower court properly left the parties where they had placed themselves."

While the facts are different, *Kennedy v. Lonabaugh*, supra, cannot conceptually be distinguished from this case. I am unable to discern any policy factors which would justify the different result. A court still should not "allow itself to be used in aid of any of the parties to an illegal agreement." *Williams v. Weber Mesa Ditch Extension Company, Inc.*, Wyo., 572 P.2d 412, 414 (1977). See also *Owens v. Capri*, 65 Wyo. 325, 202 P.2d 174 (1949); *Claus v. Farmers & Stockgrowers State Bank*, 51 Wyo. 45, 63 P.2d 781 (1936); and *Hoge v. George*, 27 Wyo. 423, 200 P. 96 (1921).

I would, albeit on a different ground, affirm the judgment of the trial court in refusing to grant an accounting for these coal permits.